Argued July 12, 1978, reversed and remanded March 20, 1979

McPHERSON, *Petitioner,*
*v.*
EMPLOYMENT DIVISION, et al,
*Respondents.*
(TC 77-AB-862, CA 8816, SC 25719)

591 P2d 1381

David W. Hittle, Salem, argued the cause for petitioner. With him on the brief were Mike Dye, Dye & Olson.

Al J. Laue, Assistant Attorney General, Salem, argued the cause for respondent Employment Division. With him on the brief were James A. Redden, Attorney General, and Walter L. Barrie, Solicitor General.

Jeanette Launer, Assistant City Attorney, Salem, argued the cause for respondent City of Salem. With her on the brief was William J. Juza, City Attorney.

Before Holman, Presiding Justice, and Tongue, Howell, Bryson, Lent, and Linde, Justices.

LINDE, J.

Tongue, J., dissenting opinion.

**LINDE, J.**

Petitioner, Marlynn McPherson, seeks review of a decision of the Employment Division denying her unemployment compensation on the ground that she left her employment voluntarily and without good cause. After the "Administrator's Decision,"[1] the claimant requested a hearing. A referee denied her claim upon findings of fact and conclusions of law that will be discussed below. The Employment Appeals Board affirmed the referee's decision. On review in the Court of Appeals, the Division's decision was affirmed by a divided court, 31 Or App 1277, 572 P2d 654 (1977), and we allowed review.

The issue is whether the Division misconstrued the unemployment compensation law in concluding that McPherson did not have "good cause" to leave her employment. That question in turn involves a question of the scope of judicial review of the Division's determinations of "good cause." This court has not previously had occasion to address these questions. For the reasons that follow, we reverse and remand petitioner's claim to the Division.

*The statute and the facts.* Since its initial enactment in 1935, the unemployment law has been a program designed to provide a source of substitute income from a public fund for any eligible unemployed person unless the person is disqualified for one of the reasons provided in the statute. In one phrasing or another, the disqualifying reasons essentially have been loss of employment due to the employee's own misconduct, giving up one's job voluntarily without good cause, and failure to apply for or to accept suitable employment. At present, ORS 657.176 provides:

> (1) An authorized representative designated by the assistant director shall promptly examine each

---

[1] The "administrator" to which this heading of the decision refers is the Assistant Director of Employment, who heads the Employment Division with the Department of Human Resources and "administer[s] the provisions" of the unemployment compensation law, ORS 657.608, or his authorized representatives, OAR 471-10-005.

claim to determine whether an individual is subject to disqualification as a result of his separation, termination, leaving, resignation, or disciplinary suspension from work or as a result of the individual's failure to apply for or accept work and shall promptly enter an assistant director's decision if required by subsection (4) of ORS 657.265.

(2) If the authorized representative designated by the assistant director finds:

(a) The individual has been discharged for misconduct connected with his work, or

(b) The individual has been suspended from work for misconduct connected with his work, or

(c) The individual voluntarily left work without good cause, or

(d) The individual failed without good cause to apply for available suitable work when referred by the employment office or the assistant director, or

(e) The individual failed without good cause to accept suitable work when offered to him,
the individual shall be disqualified from the receipt of benefits until he has performed service for which remuneration is received equal to or in excess of his weekly benefit amount in four separate weeks subsequent to the week in which the act causing the disqualification occurred.

■ As stated above, this case involves subsection (2)(c), whether the claimant "voluntarily left work without good cause." The referee's findings of fact are set forth in 31 Or App at 1279-1281, and need not be repeated here. Briefly, it appears from the findings and the undisputed evidence on which they are based that claimant was employed by the City of Salem under the CETA program in February, 1975, and hired as a regular employee in August, 1975, with the classification "Maintenance I." Throughout her employment two male coworkers with whom she was required to work complained to her and to others that they did not approve of a female worker in the maintenance position, and that she lacked the strength to do the job. They did not give McPherson information or other assistance that she needed to develop her job skills.

[544]

She filed a union grievance over additional difficulties with one of the men after she declined to date him, which was later settled by an apology. McPherson repeatedly brought the matter to the attention of her supervisor and the employer's affirmative action officer. The supervisor told her to ignore the men's remarks; he also said that he was satisfied with her work and progress and recommended her periodically for pay raises. However, claimant decided that she would not be able to obtain technical work experience on the job beyond attending courses or seminars and reading manuals. She gave notice in February, 1977, and quit the following month.

In summary, it is undisputed that claimant left work voluntarily and that she did so because of the "sexist" behavior of male employees with whom she was assigned to work and who objected to her doing "men's work." The issue before us is not whether we would reach the same decision on the facts that the Employment Division did. The purpose of our review is to determine whether the Division reached its conclusion denying claimant unemployment benefits under a misapprehension of the scope of "good cause." Before examining that question, we must clarify the appropriate scope of review.

*Scope of review.* At the outset, it should be recalled that the scope of judicial review of an administrative decision does not follow simply from the nature of the decision and of the disputed issue. The rules governing judicial review can be and generally are provided by law. In the case of a decision of the Employment Appeals Board, affirming a decision made on a formal hearing record by a referee, the scope of review is that stated for contested cases under the Administrative Procedure Act, ORS 183.482(8). That subsection presently provides:

> (8) The court may affirm, reverse or remand the order. The court shall reverse or remand the order only if it finds:
> (a) The order to be unlawful in substance or

procedure, but error in procedure shall not be cause for reversal or remand unless the court shall find that substantial rights of the petitioner were prejudiced thereby; or

. . . .

(d) The order is not supported by substantial evidence in the whole record.

The statute thus requires a party challenging an agency determination to specify, and the court to decide, whether the asserted agency error is one of fact, lacking support in the evidence, or a misapplication of the relevant substantive or procedural law. Of course the challenge may involve several grounds, but it remains necessary to identify which is which.

It is also necessary to identify the responsible agency whose order is being reviewed. In the case of unemployment compensation claims this is not self-evident. As stated above, note 1, the administration of this statute is entrusted to the Assistant Director of Employment. He is directed to "determine all questions of general policy and promulgate rules and regulations and be responsible for the administration of this chapter." ORS 657.610. Determinations with respect to a particular claimant's eligibility are made by the assistant director's "authorized representative," ORS 657.176(1), ORS 657.265. If the determination is contested, it becomes the subject of a hearing before a referee, who is appointed by the assistant director. ORS 657.650(1). A referee's decision, however, is not subject to the review and approval or disapproval of the assistant director but rather to review by the Employment Appeals Board.[2] Indeed, the assistant director may be the party seeking review of the referee's decision. In other words, the assistant director is the "agency" for setting the policy of the Division. His authorized representative is the "agen-

_____

[2] The Employment Appeals Board is composed of three members appointed by the Governor subject to confirmation by the Senate and serving part time. The assistant director has responsibility for the board's budget, ORS 657.685(6) and for prescribing regulations for "the conduct of hearings and appeals" on disputed claims, ORS 657.280.

cy" making the initial decision of a claim, which becomes operative if not contested. Only if the decision of the authorized representative is contested does the referee conduct and decide the "contested case." Thus he serves in a reviewing rather than a policy-determining capacity. OAR 471-40-025.

The identification of errors of fact and errors of law for purposes of the scope of review under ORS 183.482(8), when an agency applies a broad statutory term to a particular situation, is one of the most problematic issues in administrative law. *See, e.g.,* 4 K. C. Davis, *Administrative Law Treatise* §§ 30.01, 30.02 (1958) and later supplements; Jaffe, *Judicial Control of Administrative Action* 556-564 (1965); B. Schwartz, *Administrative Law* 642-662 (1976). Agency decisions interpreting a legal term in applying it to particular facts are sometimes said to pose a "mixed question of law and fact." *See Dobson v. Commissioner,* 320 US 489, 501 (1943); Jaffe, *Judicial Control of Administrative Action,* 546-547 (1965). The Court of Appeals has so characterized determinations of "good cause" under the unemployment compensation law. *Stevenson v. Morgan,* 17 Or App 428, 431, 522 P2d 1204 (1974). When such a determination is reviewed, however, ORS 183.482(8) calls for separating the elements of the mixture that are "facts" from those that interpret the law. It has been observed that in practice courts appear to reverse the sequence of premise and conclusion, seeming first to choose what they deem the proper scope of review and then to label the issue as one of "fact" or "law" accordingly. *See Davis, supra,* §§ 30.03—30.09, reviewing many decisions; Gellhorn and Byse, *Administrative Law* 427-428 (6th ed 1974). However, when the particular legal standard applied by the agency is examined more closely, a more consistent analysis of "mixed" questions of law and fact is possible.

■ "Facts," it has been said, are those elements entering into the decision that describe phenomena and

events without reference to their significance under the law in question, or to put it another way, as they might be described by a lay person unaware of the disputed legal issue.[3] In that sense, the claimant's reasons for quitting her employment and the events that led up to them are questions of fact. The meaning of the words "good cause" as used in ORS 657.176, on the other hand, is plainly a question of law. But that is not the end of the inquiry into the scope of judicial review, for this question of law in turn leads to the question how far ORS 657.176 entrusts to the agency the determination of what kind of reasons are "good cause" to leave employment and what kind of reasons are not.

■ In prior cases under the unemployment compensation law, this court has faced the problem of reviewing agency determinations whether various relationships between providers of services and those who pay for them constituted employment within the coverage of the act. *Baker v. Cameron*, 240 Or 354, 401 P2d 691 (1965), concluded that "if the facts are not disputed, the question of whether one is an 'employee' or the contractor of another is a question of law," citing *Journal Pub. Co. v. State U.C. Com.*, 175 Or 627, 155 P2d 570 (1945), and *Rahoutis v. Unemployment Com-*

---

[3] In *NLRB v. Marcus Trucking Co.*, 286 F2d 583 (1961), Judge Henry Friendly cited this quotation of O. W. Holmes, Jr., from Jaffe, *Judicial Review: Questions of Law*, 69 Harv L Rev 239, 241 (1955): "A finding of fact is the assertion that a phenomenon has happened or is or will be happening independent of or anterior to its legal effect." 286 F2d at 590. Of course, what to a layman may appear as a descriptive "fact" when it is legally irrelevant, for instance whether one person is another's "wife," or "son," or "employer," often becomes a question of law when that relationship is at issue.

Judge Friendly attempted to order the Supreme Court decisions involving the separation of "facts" from "law" under three heads: (1) the application to the facts of a statutory term "as to whose meaning, at least in the particular case, there is little dispute," (2) disputes involving both the propriety of agency inferences and the meaning of the statutory term, and (3) disputes primarily or only over the meaning of the statutory term. 286 F2d at 590-591. From these he distinguished a fourth situation, "where the agency has acted under a broad statutory policy as to whose detailed application it necessarily has wide discretion, e.g. . . . 'public convenience and necessity.' " Id. at n. 5.

*mission,* 171 Or 93, 136 P2d 426 (1943), although the views of the agency on the issue "should be given some consideration." 240 Or at 359-360.[4] This stops well short of the position taken in *NLRB v. Hearst Publications,* 322 US 111 (1944), that a specialized agency's view of an employment relationship within the meaning of its governing statute should be accepted if it has "a reasonable basis in law." 322 US at 131.[5] Judicial respect for an agency's interpretation of a legal term, though it is a question of law, is often explained on a theory of agency "expertise." That may apply where statutory terms are drawn from a technical vocabulary which takes its meaning from a particular science, industry, trade, or occupation in which the agency has genuine expertise, but an agency's administration of a specialized program does not mean that its political head or changing personnel either need or acquire expertise in that sense.[6] As this court said about applying the *Hearst Publications* formula to the Public Utility Commissioner's interpretation of a term in a highway use tax law, the agency's special experience calls for deference to "the degree to which the problem involves knowledge peculiar to the industry, business, etc.," knowledge which was not shown to be involved in interpreting the term at issue. *Rogers Construction Co. v. Hill,* 235 Or 352, 356, 384 P2d 219 (1963).

■ Distinct from such agency "expertise" in giving meaning to a technical or specialized terminology is the question how far the statutory term entrusts to the

---

[4] The scope of review in *Baker v. Cameron* was not defined by ORS 183.482(8) but by the Unemployment Compensation Act itself, but the distinction between "findings of fact" and "questions of law" was comparable. 240 Or at 357. For recent illustrations of review of the employment issue, *see Republic Dev. Co., Inc. v. Emp. Div.* 284 Or 431, 587 P2d 466 (1978); *Byrne Trucking, Inc. v. Emp. Div.* 284 Or 443, 587 P2d 473 (1978); *Mitchell Bros. v. Emp. Div.* 284 Or 449, 587 P2d 475 (1978).

[5] *NLRB v. Hearst Publications, supra,* was an application of the doctrine of *Gray v. Powell,* 314 US 402 (1941), which deferred to an agency interpretation of the statutory term "producer."

[6] There are different grounds for respecting the agency's interpretation when the term appears in a regulation or a statutory provision drafted by the agency itself.

agency some range of choice in carrying out the legislative policy. We do not regard the Employment Division as the kind of "expert agency" that has special knowledge of the meaning of such statutory terms as "employment," "direction or control," "independently established business," and the like. *See Baker v. Cameron, supra; Republic Dev. Co., Inc. v. Emp. Div., supra.* In those phrases, the legislature refers to relationships that meet certain definable legal tests, though applying the tests to the facts of any given. arrangement may sometimes be a close question. But the phrase "good cause" is not that kind of a statutory term. Like standards such as "fair" or "unfair," "undue" or "unreasonable," or "public convenience and necessity," "good cause" in its own terms calls for completing a value judgment that the legislature itself has only indicated: evaluating what are "good" reasons for giving up one's employment and what are not. Judicial review of such evaluations, though a "question of law," requires a court to determine how much the legislature has itself decided and how much it has left to be resolved by the agency. For an agency decision is not "unlawful in substance," ORS 183.482(8), *supra,* if the agency's elaboration of a standard like "good cause" is within the range of its responsibility for effectuating a broadly stated statutory policy.

*Review under ORS 657.176.* The history of Oregon's unemployment compensation law shows that some range of agency responsibility for defining "good cause" was intended. The original 1935 act disqualified any claimant who voluntarily left employment except for "reasonable cause attributable to his employer." Oregon Laws 1935 (Special Session) ch 70, § 4(b)(2). At the next session the legislature changed this to "good cause, if so found by the commission." Oregon Laws 1937, ch 398, § 4. The reference to the "commission" was amended to "administrator" when the Division was organized, Or Laws 1969, ch 597, § 172(2). In 1973, the section was revised from "when

so found by the administrator" so as to delegate the finding in individual cases to an "authorized representative designated by the administrator," Or Laws 1973, ch 398, § 2,[7] but we have no reason to believe that this provision for subdelegation was meant to alter the scope of the Division's responsibility.

Although referees are personnel of the Division and the Employment Appeals Board is attached to it for administrative purposes, the responsibility to which we refer has been placed in the administrator, now the Assistant Director of Employment. As stated above, he is the successor of the former State Unemployment Compensation Commission and, by the statute, succeeded to all its powers, duties and functions. ORS 657.608. He is directed to "determine all questions of general policy and promulgate rules and regulations and be responsible for the administration of this chapter." ORS 657.610. If, for instance, the Division were to issue interpretative rules describing one or more characteristics of "good cause" independently of the decision of a concrete case, the assistant director is the "agency" authorized to do so.[8] *See* ORS 183.310(1), (7). OAR 714-10-010.[9]

In prior cases, the Court of Appeals appears to have

---

[7] The change from "administrator" to "assistant director" was made in 1977, Or Laws 1977, ch 267, § 6.

[8] The Employment Appeals Board, and the referees who are subject to its review, would not be bound to follow the assistant director's interpretation if they conclude as a matter of law that it exceeds the range of defining "good cause" entrusted to the Division by the statute.

The analysis of the scope to be allowed the agency's interpretation is illustrated in *Batterton v. Francis,* 432 US 416 (1977), which involved the definition of "unemployment" (for purposes of aid to dependent children) "as determined in accordance with standards prescribed by the Secretary." The Supreme Court held that "[o]rdinarily, administrative interpretations of statutory terms are given important but not controlling significance," but that in using language like that quoted above, "Congress entrusts to the Secretary, rather than to the courts, the primary responsibility for interpreting the statutory term." 432 US at 424-425 and notes 8 and 9.

[9] The Division has in fact promulgated rules for claims and benefits governing such matters as the definition of a "week," and "full-time work," the treatment of severance pay, and the eligibility requirement of seeking or accepting "suitable" work. *See* OAR 714-30-005 to 714-30-037.

decided the question of "good cause" without always distinguishing whether the result followed because the statute itself imposed a test or rule to be applied to the facts found by the agency or only permitted the Division to adopt that test or rule. *Fajardo v. Morgan*, 15 Or App 454, 516 P2d 495 (1973), clearly intended a binding statutory interpretation both in holding that wage discrimination based on sex is "good cause" to quit because it is an unlawful employment practice, and also in adopting the "objective" test that "good cause" must be one that would "reasonably motivate in a similar situation the average able-bodied and qualified worker to give up his or her employment," 15 Or App at 459. This was later elaborated in *Stevenson v. Morgan, supra,* to mean a worker of "reasonable and normal sensitivity, . . . not the supersensitive person," 17 Or App at 432-433.[10] The same is true of *Arias v. Employment Division*, 26 Or App 841, 554 P2d 538 (1976), which held that the reason for quitting must be in some way related to the employment. *Brotherton v. Morgan*, 17 Or App 435, 522 P2d 1210 (1974), first stated that whether the "reasonable prudent person" test is met is a "factual evaluation" but then continued to affirm the administrative denial by citing court decisions from other states for the premise that personality conflicts with supervisors are not good cause. *Cantrell v. Employment Division*, 24 Or App 215, 545

[10] Taken literally, this test of "good cause" would turn its subsequent application into factfinding in order to determine, either by evidence or by official notice under ORS 183.450(4), what would motivate an average worker in a similar situation. Unlike jurors, Employment Division referees, appeals board members, and judges are not surrogates for the men and women who actually make the choice to stay or to quit employment for various reasons in a myriad different situations. The cases show that the test is not taken literally; it means "an average worker of reasonable and normal sensitivity in the opinion of the tribunal."

In the present case, for instance, the referee recited the *Stevenson* formula about the "reasonably prudent person . . . under similar circumstances," but he made no findings of what the average reasonably prudent woman does under circumstances when she meets one or another kind of male hostility, ostracism, noncooperation, or offensive personal comments and behavior in different employment situations in an office, in a school or college, or in a maintenance shop or industrial plant.

P2d 143 (1976), treated the appeals board's decision under the *Stevenson* test as one to be affirmed although reasonable minds might differ, but the court has also cited *Cantrell* as holding as a matter of law that an employee must try to resolve his job problems unless he can show that the effort would be futile. *Carson v. Employment Division,* 25 Or App 589, 550 P2d 463 (1976), *Glennen v. Employment Division,* 25 Or App 593, 549 P2d 1288 (1976). We cannot escape the impression that the court both recites its limited review of the "factual evaluation" and also states its own independent conclusion whether the claimant acted as a reasonable prudent person under the circumstances. *Compare, e.g., Vargas v. Employment Division,* 22 Or App 18, 537 P2d 569 (1975), and *Koach v. Employment Division,* 25 Or App 585, 549 P2d 1301 (1976), with *Garrelts v. Employment Division,* 21 Or App 437, 535 P2d 115 (1975). The court expressly so stated in reversing the board in *Chamblee v. Employment Division,* 23 Or App 53, 55, 541 P2d 165 (1975), citing *Baker v. Cameron, supra.*

The decision closest to the present case, *McCain v. Employment Division,* 17 Or App 442, 522 P2d 1208 (1974), is perhaps somewhat ambiguous. The Employment Appeals Board had affirmed a decision of the Division denying benefits to a woman who left her employment because of the sexist or "demeaning" attitude of her employer and some male coworkers, an attitude they expressed in defending their display of provocative pictures and a cartoon in the plant. The Court of Appeals stated that it "agreed" with the referee and the Board that this display, though "vulgar and offensive, was not good cause for claimant to quit. That alone does not show whether the court might not also have sustained the agency in the contrary conclusion that an employee has good cause to leave a place of employment marked by a pervasively insulting or derisive attitude toward persons of the employee's sexual, racial, ethnic or other characteristics beyond his or her control, after objections to the

[553]

employer fail to bring improvement—in other words, whether the court regarded the matter to be within the range of judgment entrusted to the agency. However, the *McCain* opinion continued by stating that "good cause" would exist "only if this 'sexist' attitude produced some actual discrimination" or "undue harassment," and that "offensive character habits of fellow workers, however distasteful" will not constitute "good cause." 17 Or App at 445-446. This could certainly convey to the agency that its decision was not only permitted by the statute but compelled by it. If *McCain* conveyed that impression, it certainly would affect the agency's view of the law governing the present case, in which "good cause" is also claimed to have resulted from "sexist attitudes."

*Application to the present case.* We therefore turn to the agency's decision to examine on what view of the governing law it was based. The referee's findings of fact have been summarized above. He concluded that the claimant voluntarily left work without good cause. His statement of "Conclusions and Reasons" cited the measuring stick of the "reasonably prudent person under similar circumstances" from *Stevenson v. Morgan, supra.* It then continued:

> The claimant's primary reasons for leaving work were the sexist attitudes of two co-workers and her belief that her training was not progressing as rapidly as possible. The record contains no evidence that the claimant was being denied training opportunities; in fact, it appears that she was being given a great deal of consideration for training necessary to enhance her qualifications for promotion.
> In *Fajardo v. Morgan,* 15 Or App 454, 516 P2d 495 (1973); the Court held that discrimination based on sex may constitute good cause to quit work. The record, however, lacks any evidence that the claimant was discriminated against by the employer. The claimant received favorable performance appraisals and periodic merit pay raises. Although it was possible that the sexist attitudes of the claimant's two co-workers could have affected her training and

[554]

career development, it does not appear that the claimant's career was adversely affected.

The referee's opinion then stated that the present case was similar to *McCain v. Employment Division, supra.* The remainder of his "Conclusions and Reasons" consisted simply of an extensive quotation from the opinion of the Court of Appeals in *McCain,* including the following:

"Good cause" would exist only if [an employer's] "sexist" attitude produced some actual discrimination, undue harassment, or other grievous cause of reasonable foundation, . . .

Generally, offensive character habits of fellow workers, however distasteful they may be to claimant, will not constitute "good cause" for claimant to leave. . . . Thus, claimant must at least establish that the prevailing sexual attitudes of her employer, or of her fellow employes, were such as amounted to sexual discrimination, harassment or some other cause of reasonable foundation sufficiently grievous to compel a reasonably prudent person to quit under similar circumstances. . . .[11]

The referee's opinion concluded: "The Claimant in the present case has failed to show discrimination, harassment, or other cause sufficient to constitute good cause for having left work." The appeals board adopted these findings, conclusions and reasons without change.

Since the referee thus based his decision entirely on the quoted opinion in *McCain,* he apparently assumed that his conclusions were not merely permitted but compelled as a matter of law. As stated above, this assumption takes an improperly narrow view of the Division's own responsibility to define "good cause" within the overall policy and provisions of the unemployment compensation law. But there is little in the record or briefs to show what criteria of "good cause" the Division might develop in the absence of that misconception. One reason is that the Division filed no

[11] 17 Or App at 445-446. We do not know what is meant by the phrase "cause of reasonable foundation" used twice in this quotation.

brief in the Court of Appeals and did so in this court only in response to a particular question posed by the court. Although unemployment claims are paid by the state, and the Division is the responsible respondent when a claimant petitions for review of its denial of benefits, the Division sometimes seems to regard these cases as a controversy between the claimant and the employer who objects in order to protect his "experience rating" for purposes of the unemployment tax rate, and to cast its referee and the appeals board in the role of umpire between these two parties. However, while the employer's interest is recognized in the procedures, ORS 657.265—657.282, it is properly the role of the agency to articulate its policies and defend its decisions in administering the program entrusted to it.

From its response to this court's question, we learn that the Division is generally satisfied with the broad *Stevenson* formulation discussed above. But its assumptions concerning other issues relevant to the present case appear at most by inference. For instance, passages in the referee's Conclusions and Reasons suggest an assumption that the grounds for leaving a job, to qualify as "good cause" under the statute, must be attributable to the employer. This impression is reinforced by the quotation in the Division's brief of a decision from Florida, where this is a part of the statutory test.[12] Yet as we have noted, in this state that requirement was repealed soon after the enactment of the unemployment compensation law. The purpose of the statute is to provide a means of living for an unemployed worker, not to compensate her for a wrong done by the employer. Other passages in the referee's opinion suggest an assumption that "good cause" to leave a workplace must not be merely work-related but must arise out of the economic, physical, or other directly occupational aspects of the job. That, too, is not required by the statute itself. The

---

[12] *Uniweld Products, Inc. v. Industrial Rel. Comm'n, etc.,* 277 S2d 827, 829-830 (Fla Dist Ct App 1973).

law does not extend its benefits to a worker who has a job and voluntarily gives it up without "good cause." But it also does not impose upon the employee the one-dimensional motivation of Adam Smith's "economic man." The workplace is the setting of much of the worker's daily life. The statute does not demand as a matter of law that he or she sacrifice all other than economic objectives and, for instance, endure racial, ethnic, or sexual slurs or personal abuse, for fear that abandoning an oppressive situation will disqualify the worker from unemployment benefits. *Cf., e.g., Taylor v. Unemp. Comp. Bd. of Review,* 474 Pa 351, 378 A2d 829 (1977). How far "good cause" encompasses such non-economic values also is left to the agency in the first instance.

■ *Conclusion.* As stated above, there are implications in the referee's "Conclusions and Reasons," adopted by the Employment Appeals Board, that the agency assumed its decision to be compelled as a matter of law by the statute, as interpreted by the Court of Appeals in *McCain v. Employment Division, supra.* We cannot discern what criteria of "good cause" the agency might have applied on its own in the absence of that assumption. This does not mean that on the present record the Court of Appeals or this court might not have reached the same result. That, however, is not our assignment but the Division's, subject only to review whether its assessment of the kind of reasons that are "good cause" to leave employment is "unlawful in substance." For these reasons, the case must be remanded to the Division for reconsideration by the assistant director's authorized representative in the light of this opinion.

Reversed and remanded.

**TONGUE, J.,** Dissenting.

As stated by the majority, this court can only reverse the order of the Employment Division in this case if that order was "unlawful in substance or procedure" or was "not supported by substantial evi-

dence" in the record (ORS 183.482(8)). The majority does not hold either that the order was "unlawful" or that it was "not supported by substantial evidence."

Instead, the majority has remanded this case to the Employment Division for the development of "criteria" of "good cause," based upon a theory which was not urged or discussed by either party in this case, and was not submitted to them by this court as a question on which this court was interested in hearing argument upon the hearing of this petition for review.

As a result, neither party has had an opportunity to be heard on this question and this court has not had the benefit of a scrutiny of that theory through the operation of the adversary process.

This case was argued on July 12, 1978. During the subsequent eight months there has been ample time for this court to request the parties to submit supplemental briefs on this question. Once this court has decided a case upon a theory not briefed and argued by the parties, the procedure provided by a petition for rehearing does not provide a fair and satisfactory means through which the parties may attempt to persuade the court that it was in error in deciding the case upon a theory which it has already approved and adopted. *See LaGrande/Astoria v. PERB,* 281 Or 137, 576 P2d 1204, on rehearing 284 Or 173, 586 P2d 765 (1978).

The decision of this case has now been delayed so long, however, that it may not now be advisable to delay its decision further by a request for supplemental briefs. *See* concurring opinion, *State v. Classen,* 285 Or 221, 238, 590 P2d 1198 (1979).

With all due respect to the majority, "this is [no] way to run a railroad."