Argued and submitted September 22, 1982, resubmitted In Banc September 9, reversed and remanded with instructions October 12, 1983, reconsideration February 10, petition for review dismissed April 27, 1984 (297 Or 83)

In the Matter of the Compensation
of William R. Carr, Claimant.

## CARR,
*Petitioner,*

*v.*

## SAIF CORPORATION,
*Respondent.*

(WCB No. 80-00053; CA A23840)

670 P2d 1037

Steven C. Yates, Eugene, argued the cause and filed the brief for petitioner.

Darrell E. Bewley, Appellate Counsel, SAIF Corporation, Salem, argued the cause and filed the brief for respondent.

WARREN, J.

Richardson, J., concurring.

Joseph, C. J., dissenting.

## WARREN, J.

Claimant seeks review of an order of the Workers' Compensation Board, affirming the suspension of his temporary total disability benefits under ORS 656.325 and the administrative rules adopted thereunder, because claimant failed to attend a medical examination scheduled for him by SAIF. Claimant contends that the suspension was unlawful, because he had notified SAIF of a valid reason why he would not be able to attend the scheduled examination. He also contends that the procedures employed by the Workers' Compensation Department (Department) under ORS 656.325 and OAR 436-54-281 and 436-54-283, which allowed it to suspend his benefits without providing him with notice and an opportunity for a hearing before the suspension, violated his right to due process of law under the United States and Oregon Constitutions. We reverse.

In December, 1979, claimant sustained injuries to his spine in the course and scope of his employment. The claim was accepted, and SAIF began paying him temporary total disability compensation on December 17, 1979. Claimant, a Eugene resident, became a patient of a Eugene orthopedic surgeon, who eventually requested that SAIF refer him to another physician because he had missed several appointments. SAIF scheduled an appointment with another Eugene physician, who reviewed the medical records and informed SAIF that he did not want to treat claimant.

On May 16, 1980, SAIF sent claimant a notice of appointment for the examination at issue. The notice informed him that he was scheduled for an examination by Orthopaedic Consultants in Portland on June 5, 1980, and that his failure to keep the appointment without notifying SAIF before the appointment of a valid reason why he could not attend would result in suspension of compensation under ORS 656.325 and OAR 436-54. The purpose of the examination was to determine the type of treatment claimant required, whether he was medically stationary and when he could return to work.

By letter dated May 19, 1980, claimant's attorney informed SAIF that claimant's wife was due to have a baby on June 5 and requested that the appointment be rescheduled for some time after July 1, 1980. SAIF told claimant's attorney by

phone on June 2, 1980, and by letter dated June 5, 1980, that it insisted that claimant keep the appointment.

On June 4, 1980, claimant's attorney called SAIF and reported that claimant's wife was enroute to the hospital to give birth. SAIF responded that, if the baby was born at a reasonable hour on June 4, claimant must keep the appointment. SAIF's claims representative attempted to verify that claimant's wife had been admitted to a hospital. Although the claims representative did not know the wife's name or her obstetrician's name, she called all of the hospitals in the Eugene area that she believed had obstetrical departments on June 4 and 5, 1980, and was told that no Mrs. Carr had been admitted. On June 5, 1980, she verified that claimant did not keep his appointment. On June 6, 1980, the claims representative called claimant's attorney, who said that he had been unable to contact claimant to determine what hospital his wife had entered and whether she had given birth. The claims representative told the attorney that SAIF intended to petition the Department for suspension of compensation. Later that day, the claims representative tried unsuccessfully to contact claimant.

On June 6, 1980, SAIF petitioned the Department's Compliance Division for suspension of benefits in a letter that stated most of the facts discussed above. On June 18, 1980, SAIF's claims supervisor called the attorney to inquire whether claimant's wife had given birth. He said that she had not. An assistant claims supervisor of the Division processed the petition. Her inquiry consisted of a call to Orthopaedic Consultants to verify that claimant failed to keep his appointment and a call to SAIF on June 24, 1980, to verify that claimant's wife had not yet given birth.

On the basis of those two calls and the information contained in the petition, the Division decided to suspend compensation. The assistant claims supervisor informed claimant of the decision by a letter dated June 24, 1980, which stated, in part:

"On June 4, 1980 your attorney advised State Accident Insurance Fund that your wife was on the way to the hospital to await delivery of her baby.

"State Accident Insurance Fund advises that upon making a check with all of the hospitals in your area there is no record

for the admittance of your wife to any of the local hospitals. They also advise that your wife has not yet delivered the baby.

"Therefore I find *no valid reason available to me* to indicate you could not attend the June 5, 1980 examination with Orthopaedic Consultants.

"The Department, pursuant [to] ORS 656.325 and OAR 436.54, *[sic]* has no alternative but to give State Accident Insurance Fund authorization to suspend your compensation as of June 5, 1980. The suspension may continue until such time as you have notified them of your agreement to be examined, and in fact, submit to an examination by [a] physician designated by them. * * *" (Emphasis supplied.)

On June 27, 1980, claimant requested a hearing on the suspension. On September 5, 1980, a hearing began concerning three issues relevant to claimant's compensation, including whether the suspension was reasonable. On February 20, 1981, another hearing was held, and by May 8, 1981, the parties filed written arguments on the three issues. On May 22, 1981, the referee issued his opinion and order. He affirmed the Division's decision to suspend compensation and refused to consider claimant's constitutional challenge.[1] The Board affirmed the referee, and claimant filed this appeal.

■　　　The first question is whether the Division's decision to suspend compensation under ORS 656.325 and OAR 436-54-281 and 436-54-283 was arbitrary or unreasonable. It is clear from the record that SAIF and the Division followed the applicable statutory and regulatory procedures. We do not address the reasonableness of those procedures. The narrow focus of our inquiry is whether, on the basis of the facts the Division had before it through those procedures, the *substance* of its decision that claimant had no valid reason for missing his appointment was arbitrary or unreasonable. We have reviewed the record and conclude that the Division's decision was not arbitrary or unreasonable.

■　　　The other and quite different issue is whether the *procedure* used by the Division under ORS 656.325 and OAR 436-54-281 and 436-54-283, which allowed it to suspend claimant's benefits without providing him with notice and an

---

[1] The referee also decided that claimant was entitled to benefits for temporary total disability payments at a rate higher than that previously determined and that the extent of his permanent partial disability was correctly determined. These portions of the decision are not before us.

opportunity to be heard *before* the suspension, deprived him of his right to procedural due process under the Fourteenth Amendment and the "due course of law" provision of Article I, section 10, of the Oregon Constitution. The procedural due process protection of the "due course of law" provision is essentially the same as that of the Fourteenth Amendment. *Tupper v. Fairview Hospital,* 276 Or 657, 664 n 2, 556 P2d 1340 (1977).[2] This issue, therefore, involves three questions: whether claimant had a constitutionally significant interest in his temporary total disability benefits, whether the deprivation of the interest involved government action and whether the procedures employed by the Division were constitutionally adequate.

ORS 656.325(1) provides, in relevant part:

"Any worker entitled to receive compensation under ORS 656.001 to 656.794 is required, if requested by the director, the insurer or self-insured employer, to submit to a medical examination at a time and from time to time at a place reasonably convenient for the worker and as may be provided by the rules of the director. * * * If the worker refuses to submit to any such examination, or obstructs the same, the rights of the worker to compensation shall be suspended with the consent of the director until the examination has taken place, and no compensation shall be payable during or for account of such period."

OAR 436-54-283(2) requires that SAIF notify a worker ten days before the examination of its purpose, date, time and place and that the notice include the following paragraph in bold-face type:

"ATTENDANCE OF THIS EXAMINATION IS MANDATORY. YOU ARE RESPONSIBLE FOR NOTIFYING

---

[2] In response to the position in the concurring opinion in *Tupper v. Fairview Hospital,* 276 Or 657, 556 P2d 1340 (1977), that Article I, section 10, of the Oregon Constitution, should be interpreted to require more extensive procedural protections than the Fourteenth Amendment, the majority stated:

"* * * [T]he procedural effect of state 'due course of law' constitutional provisions is essentially the same as the procedural effect of the due process clause of the fourteenth amendment to the federal constitution. Therefore, in the absence of some compelling public interest in giving Art 1, § 10, of our constitution a broader interpretation in this situation than that given to the due process clause of the fourteenth amendment by the federal courts, we decline to adopt such a construction. * * *" 276 Or at 664 n 2.

US PRIOR TO THE DATE OR TIME OF THE EXAM-
INATION OF ANY VALID REASON WHY YOU CAN-
NOT ATTEND AS SCHEDULED. FAILURE TO
ATTEND THIS EXAMINATION, OBSTRUCTION OF
SAME, OR AN INVALID REASON FOR NOT ATTEND-
ING SHALL RESULT IN SUSPENSION OF YOUR COM-
PENSATION BENEFITS PURSUANT TO ORS 656.325
AND OAR 436-54."

OAR 436-54-281 gives the Division the authority to issue
orders of consent to suspend compensation if a worker fails to
attend the examination. OAR 436-54-283(5) describes the
required contents of SAIF's application to the Division for
suspension of compensation:

"The insurer or self-insured employer requesting consent
to suspension of compensation because of a worker's failure or
refusal to submit to a medical examination, or obstruction of
same, shall apply to the Compliance Division. The application
in letter form shall contain the following information:

"(a) consent for suspension of compensation is requested
pursuant to ORS 656.325 and OAR 436-54;

"(b) what the worker was requested to submit to;

"(c) whether the attending physician was consulted to
choose a mutually agreeable examining physician;

"(d) that the worker failed or refused to be examined and
did not advise of any valid reason why the examination could
not be attended as scheduled; (If a reason was provided but is
considered invalid, explain.)

"(e) the date that verification of failure to attend was
obtained from the examining physician, facility or their staff;
(Any delay in obtaining verification or in requesting consent
for suspension of compensation may result in authorization
being denied or the date of authorization be modified by the
date of actual verification or the date the request is received
by the Compliance Division.)

"(f) the date, time and place of any rescheduled exam-
ination; and

"(g) any pertinent information that supports the request
for suspension of compensation."

Under the statutory system and the rules, a claim-
ant's compensation is suspended for the period between the
date of the scheduled examination that he does not attend and
any rescheduled examination that does take place. If the

suspension is valid, benefits for that period are forfeited and are not recoverable retroactively.

■ The first issue is whether claimant had a constitutionally significant interest in his temporary total disability benefits. "The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." *Board of Regents v. Roth,* 408 US 564, 569, 92 S Ct 2701, 33 L Ed 2d 548 (1972). Interests encompassed by the Fourteenth Amendment's protection of property include interests in tangible property, *e.g; Fuentes v. Shevin,* 407 US 67, 92 S Ct 1983, 32 L Ed 2d 556 (1972), and certain interests in benefits, *Slochower v. Board of Education,* 350 US 551, 76 S Ct 637, 100 L Ed 692 (1956) (tenured professor's interest in continued public employment).

In *Roth,* the Court analyzed the nature of these interests in benefits that are protected by the Fourteenth Amendment:

> "* * * To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. * * *
>
> "Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits. * * *" 408 US at 577.

Using this analysis, the Court has held that the requirements of procedural due process apply to the termination of Social Security disability benefits, *Mathews v. Eldridge,* 424 US 319, 96 S Ct 893, 47 L Ed 2d 18 (1976), and welfare benefits, *Goldberg v. Kelly,* 397 US 254, 90 S Ct 1011, 25 L Ed 2d 287 (1970), because the recipients' claims of entitlement to the benefits were grounded in the statutes defining eligiblity for them.

■ The nature of claimant's interest in workers' compensation benefits here differs in one respect from the recipients' interests in *Mathews* and *Goldberg,* where the benefits were paid directly by the government. Claimant's entitlement

to workers' compensation benefits derives from the requirement of state law directing that employers provide specific benefits for injured workers. ORS 656.017. Eligibility for such benefits is defined by state law. There is no dispute that claimant incurred a "disabling compensable injury" under ORS 656.005(8) and was entitled to "temporary total disability" benefits under ORS 656.210. He was entitled to receive those benefits until it was determined that his disability was permanent, ORS 656.268, or no longer total, or that his benefits could be suspended under ORS 656.325. Therefore, even though the benefits are paid by the employer, SAIF or another insurer rather than the state, claimant's right to continuing benefits, derived from state law, is a property interest encompassed by the Fourteenth Amendment.

■ A person's constitutionally significant property interest is protected by the Fourteenth Amendment against governmental rather than private infringement. *Flagg Brothers, Inc. v. Brooks,* 436 US 149, 156, 98 S Ct 1729, 56 L Ed 2d 185 (1978). The procedural protections of the Fourteenth Amendment apply if the government is overtly involved in a private deprivation of protected property rights. 436 US at 157. *See also Fuentes v. Shevin, supra.* Under ORS 656.325 and OAR 436-54-281 and 436-54-283, the Workers' Compensation Department, a state agency, investigates an insurer's request for suspension of benefits, decides whether suspension is appropriate, and informs the claimants of its decision. The deprivation here is clearly governmental. Because claimant's interest in his benefits are encompassed by the Fourteenth Amendment, the state, through the Division, could not lawfully deprive him of them without due process of law.

■ Having decided that due process applies, the question remains what process is due. Except in unusual circumstances,[3] due process requires, at a minimum, that a

---

[3] In *Memphis Light Gas & Water Div. v. Craft,* 436 US 1, 19, 98 S Ct 1554, 56 L Ed 2d 30 (1978), the Court said:

"Ordinarily, due process of law requires an opportunity for 'some kind of hearing' prior to the deprivation of a significant property interest. * * * On occasion, this Court has recognized that where the potential length or severity of the deprivation does not indicate a likelihood of serious loss and where the procedures underlying the decision to act are sufficiently reliable to minimize the risk of erroneous determination, government may act without providing additional 'advance procedural safeguards,' * * *"

governmental deprivation of a property interest be preceded by some form of notice of the contemplated action and some opportunity to be heard informally if the action is contested. *Mathews v. Eldridge, supra; Goss v. Lopez,* 419 US 565, 95 S Ct 729, 42 L Ed 2d 725 (1975); *Goldberg v. Kelly, supra; Tupper v. Fairview Hospital, supra; Hammer v. OSP,* 276 Or 651, 556 Pd 1348 (1976). The form of the notice and an opportunity to be heard which is required varies from case to case, depending on the circumstances and interests involved.

> "* * * [I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. * * *" *Mathews v. Eldridge, supra,* 424 US at 335; *see also Tupper v. Fairview Hospital, supra,* 276 Or at 662.

The factors to be weighed here are similar to those weighed in *Mathews,* which involved the termination of disability benefits under the Social Security Act. In 1968, Eldridge began receiving disability benefits, because he could not engage in substantial gainful activity as a result of physical and mental impairment. In 1972, he responded to a detailed questionnaire from the agency administering the Act regarding his condition at that time. On the basis of the questionnaire and reports from Eldridge's physician and a psychiatric consultant, the agency made a tentative determination that his disability had ceased. Pursuant to administrative rules, the agency sent Eldridge a letter informing him of the proposed termination of benefits, providing a summary of the evidence on which the proposed termination was based and informing him of his rights to review the medical reports and his file and to respond in writing and submit additional evidence. After Eldridge refused to submit additional evidence, the agency made a final determination to terminate benefits. Eldridge brought an action, arguing that due process required a trial-type hearing prior to termination of his benefits. The Court balanced the three factors quoted above and held "that an evidentiary hearing is not required prior to the termination of disability benefits and that the present

administrative procedures fully comport with due process." 424 US at 349.

As to the first factor, the Court reasoned that, because the Act provided that a recipient whose benefits were terminated was entitled to full retroactive relief if he ultimately prevailed, his sole interest was in the uninterrupted receipt of his benefits pending final administrative decision on his claim. The Court found that interest to be significant, because a disabled recipient would be unable to ameliorate the interim loss through temporary employment and the delay between termination of benefits and final decision after a post-termination evidentiary hearing exceeded one year. 424 US at 340.

In the case at bar, claimant's interest in the uninterrupted receipt of temporary total disability benefits is the same as that of the recipient in *Mathews,* except in one respect. In *Mathews,* recipients could potentially be without benefits until after final administrative review over one year after termination; here, suspension of benefits lasts only until claimant attends a rescheduled examination. ORS 656.325(1). Although the evidence shows that it was unusually difficult for SAIF to schedule appointments for this claimant, it rescheduled him for an examination only six weeks after the effective date of his suspension. Therefore, although the interest of claimant in temporary total disability benefits is significant, it is generally less than the interest of a recipient in *Mathews.*

Claimant's interest in continued benefits is analogous to that of the utility customers in *Memphis Light, Gas & Water Div. v. Craft,* 436 US 1, 98 S Ct 1554, 56 L Ed 2d 30 (1978), whose utility services were terminated due to nonpayment of a disputed billing charge. The ratepayers were notified before termination that failure to pay the bill by a certain date would result in termination of services. They were not notified of any available pretermination administrative procedure for contesting the proposed termination. In holding that the utility's actions in terminating service deprived the ratepayers of a property interest without due process, the United States Supreme Court said:

> "Utility service is a necessity of modern life; indeed, the discontinuance of water or heating for even short periods of time may threaten health and safety. * * *" 436 US at 18.

Here, temporary total disability benefits are designed to provide a substitute for income lost due to a worker's temporary inability to otherwise provide for himself. Deprivation of compensation, even for a relatively brief period of time, and the resulting possible loss of ability to acquire essential goods and services, may threaten the health and safety of the worker and his dependents.

Concerning the second factor, the Court in *Mathews* concluded that the risk of an erroneous determination to terminate benefits under the agency's pretermination procedures was not great. The Court emphasized several bases for that conclusion. First, the determination was based on medical reports written by experts, and generally questions of veracity and credibility were not present. Second, because the notice of the proposed termination contained a summary of the relevant evidence and the recipient had the right to review his file, he could mold his arguments to the precise issues that the decisionmaker regarded as crucial. Third, the recipient's opportunity to present additional evidence and arguments before termination allowed him to challenge both the accuracy of the information in his file and the correctness of the agency's tentative conclusion. 424 US at 344.

Like the recipients in *Mathews,* claimants are entitled to a post-suspension evidentiary hearing. ORS 656.325(6).[4] Unlike the extensive pretermination procedures in *Mathews* that minimized the risk of an erroneous decision to terminate benefits, however, virtually no presuspension procedural safeguards applied to the suspension of benefits here. The only provision for presuspension notice to claimants

---

[4] ORS 656.325(6) provides:

"Any party may request a hearing on any dispute under this section pursuant to ORS 656.283."

ORS 656.283 provides, in part:

"(1) Subject to ORS 656.319, any party or the director may at any time request a hearing on any question concerning a claim. * * *

"* * * * *

"(2) A request for hearing may be made by any writing, signed by or on behalf of the party and including the address of the party, requesting the hearing, stating that a hearing is desired, and mailed to the board.

"(3) The board shall refer the request for hearing to a referee for determination as expeditiously as possible."

under ORS 656.325 and OAR 436-54-283 is the paragraph in the notice of appointment informing a claimant that failure to attend the examination for an invalid reason will result in the suspension of benefits. OAR 436-54-283(2). No statute or rule requires the insurer to inform claimants that it considers their reasons to be invalid or requires the Division to inform claimants that the insurer has petitioned to suspend benefits.

■ Here, SAIF informed claimant on June 6, 1980, that his reason for failing to attend his June 5, 1980, appointment was invalid and that it would petition the Division for suspension of his benefits. However, claimant was never notified by SAIF or the Division that SAIF had, in fact, petitioned for suspension or that the Division was considering suspension. Further, claimant could reasonably have inferred from SAIF's June 18, 1980, call to his attorney, inquiring about his wife's condition, that SAIF had not petitioned for suspension. Thus, the notice claimant received did not achieve the goal of adequate notice to inform one whose interests may be affected that the suspension was pending so he could choose whether to contest it before suspension. *Goss v. Lopez, supra,* 419 US at 579; *Tupper v. Fairview Hospital, supra,* 276 Or at 664-65; *Hammer v. OSP, supra,* 276 Or at 654-55.

SAIF argues that ORS 656.325(6) and 656.283, which give claimants the right to a hearing on any question involving the reasonableness of the scheduled time for an examination, minimize the risk of an erroneous suspension. We disagree for two reasons. First, because there is no provision that a claimant receive notice that the insurer has petitioned for suspension, he would have to request a hearing and spend time and money preparing his case before he knows whether his benefits are in jeopardy. Second, no statutes or rules require that a claimant be given an opportunity to be heard informally *before* benefits are suspended.

Under the existing presuspension procedures, there is a significant risk of an erroneous decision to suspend benefits. The determination whether a reason for failing to attend an examination is valid will often turn on information solely in the possession of a claimant and the claimant's veracity and credibility. However, the applicable statutes and rules do not require the Division to contact claimants prior to suspension. The Division's assistant claims supervisor testified that a suspension decision is usually made on the basis of the

petition and contacts with the insurer and that she processed approximately 1500 petitions between 1977 and 1980 but contacted claimants in only two or three of those.

The facts of this case illustrate the risk of an erroneous decision to suspend benefits under the existing presuspension procedures. The issue was whether claimant had a valid excuse for missing his June 5, 1980, appointment. Claimant's attorney notified SAIF on June 4 that claimant's wife was enroute to the hospital to give birth. SAIF's claims representative concluded that this reason was invalid, because she could not verify that claimant's wife had been admitted to a hospital. She admitted, however, that she called only the hospitals in the Eugene area that *she believed* had obstetrical departments and that she did not know the names of claimant's wife or her obstetrician.

The Division's assistant claims supervisor testified that claimant's reason would have been valid if his wife had been in false labor or her obstetrician had told claimant to stay with her at home. Nevertheless, without contacting claimant, she concluded on the basis of SAIF's petition that the reason was invalid. Under these circumstances, the potential for an erroneous suspension were significant. It is possible that SAIF could not verify that claimant's wife was admitted to a hospital because she went to a hospital outside of the Eugene area, because she went to a hospital without an obstetrical department due to an emergency, because she went to a hospital in the Eugene area with an obstetrical department that the claims representative was unaware of, because her last name was different from that of her husband, because she went to her obstetrician's office rather than a hospital or a myriad other reasons.

Regarding the third factor, the Court in *Mathews* concluded that the government's interest was substantial because of the increased administrative burden and expense of providing pretermination trial-type hearings and the expense of benefits to ineligible recipients. 424 US at 347. Although the expense of paying benefits to ineligible claimants is like that in *Mathews*,[5] the Division's burden of providing some

[5] In *Mathews v. Eldridge,* 424 US 319, 96 S Ct 893, 47 L Ed 2d 18 (1976), the Act provided that, if a beneficiary received payments to which he was not entitled, the agency could recoup these payments by reducing other benefits to which the beneficiary was entitled. 424 US at 339 n 22. Under OAR 436-54-320, the insurer can recoup overpayments in a similar manner.

sort of presuspension notice and an opportunity to be heard would be minimal. By simply sending a claimant a copy of the insurer's application for suspension, the Division would give him adequate notice that the insurer had petitioned for and the Division was considering suspension, notice of the charges against him and notice of evidence on which the insurer relies. The Division could then give a claimant an opportunity to respond informally, orally or in writing. The risk of erroneous suspension would be significantly reduced if claimants were provided these minimal presuspension procedural safeguards, because they could inform the Division of facts solely in their possession that may be essential to a fully informed decision.

■ On the basis of *Mathews v. Eldridge, supra,* and our balancing of the three factors, we conclude that, in addition to the right to a post-suspension evidentiary hearing, claimant was entitled to the following presuspension procedural safeguards: (1) notice that SAIF had petitioned for and the Division was considering suspension of his benefits; (2) notice of the basis on which SAIF contended that benefits should be suspended and of the evidence SAIF relied on; and (3) an opportunity informally to respond to SAIF's contentions either orally or in writing. *See Tupper v. Fairview Hospital, supra,* 276 Or at 665.[6]

Because none of these procedural safeguards were provided, we hold that the procedures employed under ORS 656.325 and OAR 436-54-281 and 436-54-283 to suspend claimant's benefits did not comply with the procedural due process guarantees of the Fourteenth Amendment and Article I, section 10, of the Oregon Constitution. Because his suspension was invalid, claimant was entitled to receive temporary total disability benefits until he was suspended pursuant to procedures that complied with due process or he was no longer medically eligible, whichever came first. The uncontroverted medical evidence shows that on July 25, 1980, claimant became medically stationary and was released for work with limitations due to a permanent impairment. Therefore, he was entitled to temporary total disability benefits until that date.

---

[6] We do not purport to tell the state how it must act in deciding whether to suspend benefits under ORS 656.325. We merely outline the minimum requirements of due process and leave it to the agency to adopt rules mandating the specific procedures it will follow to guarantee that claimants' constitutional rights will not be violated.

Reversed and remanded for entry of an order award-
ing claimant temporary total disability benefits at the rate
determined by the referee from June 5, 1980, until July 25,
1980.

### RICHARDSON, J., concurring.

I agree with the holding and with most of the reason-
ing in the lead opinion. My first reason for writing separately
is to expand upon the opinion's analysis of the relationship
between this case, involving benefits payable by private
employers and insurers,[1] and *Mathews v. Eldridge,* 424 US
319, 96 S Ct 893, 47 L Ed 2d 18 (1976), *Goldberg v. Kelly,* 397
US 254, 90 S Ct 1011, 25 L Ed 2d 287 (1970), and other cases
involving "benefits * * * paid directly by the government." 65
Or App at 118. I do not understand those cases to be the
principal authority supporting our holding that due process
protections attach to claimant's interest in continued pay-
ment of his benefits. In my view, claimant's due process rights
arise because the procedure for terminating his privately-paid
benefits is affected with state action, and cases such as *Flagg
Brothers, Inc. v. Brooks,* 436 US 149, 98 S Ct 1729, 56 L Ed 2d
185 (1978), and *Fuentes v. Shevin,* 407 US 67, 92 S Ct 1983, 32
L Ed 2d 556 (1972), are the authority for our decision.

I do not think the lead opinion says otherwise.
However, some confusion arises from its reliance on *Mathews,
Goldberg* and similar cases in its discussion of whether claim-
ant has a constitutionally significant interest in the con-
tinuity of his benefits. Here, as in *Goldberg* and *Kelly,* the
*source* of the interest is governmental, *i.e.,* a statutory or
regulatory requirement. But unlike *Goldberg* and *Mathews,*
where a government was the obligor as well as the source of
the mandate, the requirement here falls upon private employ-
ers and insurers. The relationship between insurers and
claimants is no less "private" because it is statutorily-defined
than it would be if it were contractual. In other words,

---

[1]Although SAIF is the insurer involved in this case, I understand the majority's
holding to apply to *all* employers and insurers subject to the Workers' Compensation
Law. The vast majority are not governmental bodies. My use of terms such as
"private" in this opinion should be understood as generic language referring to the
typical employer or insurer, and should surely not be understood as a specific comment
on SAIF's status.

*Goldberg* and *Mathews* may further the analysis of whether claimant has a constitutionally protectible interest, but they cease to be relevant after that question is answered. Thereafter, claimant's interest is the equivalent of a private contract right or of an interest in tangible property. The question becomes whether the governmental involvement in terminating the interest is sufficient to constitute state action, and not whether the interest being terminated is in a governmental benefit. I agree with the answer in the lead opinion and, consistent with the foregoing, I also think that that opinion answers the right question.

My second reason for writing separately is that I question the need and the appropriateness of the specificity of the lead opinion's answer to the question "what process is due." The opinion's detailed discussion of required procedures may invade the board's authority to adopt its own procedures. *See McPherson v. Employment Division,* 285 Or 541, 591 P2d 1381 (1979). In any event, the detailed treatment is extraneous, because nothing is to take place on remand which involves the application of due process pre-termination requirements.[2]

Warden, J., joins in this concurring opinion.

**JOSEPH, C. J.,** dissenting.

Although Judge Richardson's concurring opinion expresses some of my doubts about the majority's view, I cannot join in the concurrence, for I would hold that the petitioner had all the process that was due. I therefore dissent.

Stripped down to its necessary fundamentals, the majority's opinion rests on *Memphis Light, Gas & Water Div. v. Craft,* 436 US 1, 98 S Ct 1554, 56 L Ed 2d 30 (1978), which the majority finds is analagous and compelling. Although it is my view that that case comes perilously close to an absurd extension of *Board of Regents v. Roth,* 408 US 564, 92 S Ct 2701, 33 L Ed 2d 548 (1972), I need not dispute its validity, because it is distinguishable on the facts. The majority points out:

---

[2]The lead opinion's footnote 6, 65 Or App at 124 , does not satisfy my concern, although it does make it apparent that the majority does not share that concern.

"* * * The ratepayers were notified before termination that failure to pay the bill by a certain date would result in termination of services. They were not notified of any available pretermination administrative procedure for contesting the proposed termination." 65 Or App at 120.

In the case before us claimant's claim had been accepted, and he was receiving temporary total disability compensation. He was given express notice that his failure to keep a medical appointment without notice to the insurer of a valid reason why he could not would result in suspension of compensation. The record is perfectly clear that from that point on claimant avoided any contact with SAIF about the problem; to be sure, the record discloses that he avoided contact with his own attorney. Keeping in mind that, to avoid suspension, all claimant needed to do was either to keep an appointment of which he had notice or to notify the insurer of a substantial reason why he could not, we should recognize that we are not dealing here with governmental action that is unreasonable or arbitrary. We should also recognize, then, that there is no substantial due process problem.[1]

Therefore, I dissent.

Gillette, Van Hoomissen and Young, JJ, join in this dissent.

---

[1] ORS 656.325 provides, with respect to required medical examinations:

"* * * If the worker refuses to submit to any such examination, or obstruct the same, the rights of the worker to compensation shall be suspended with the consent of the director until the examination has taken place, and no compensation shall be payable during or for account of such period."

Under this provision, suspended benefits are apparently permanently lost, even if the worker subsequently submits to and satisfies a medical examination. (Presumably, if the worker prevails after a hearing on a medical examination dispute under ORS 656.325(6) and ORS 656.283, the suspended benefits would have to be paid.) If the facts here actually presented the threat of an unfair, arbitrary or unreasonable loss of benefits, the majority's analysis might be well taken.