Argued and submitted December 2, 1997; resubmitted En Banc February 3, affirmed March 17, petition for review allowed August 10, 1999 (329 Or 319)

In the Matter of the Compensation of
George D. Koskela, Claimant.

George D. KOSKELA,
*Petitioner,*

*v.*

WILLAMETTE INDUSTRIES, INC.,
*Respondent.*

(WCB 95-08576; CA A97325)

978 P2d 1018

David W. Hittle argued the cause for petitioner. With him on the brief was Burt, Swanson, Lathen, Alexander, McCann & Smith.

David L. Johnstone argued the cause for respondent. With him on the brief were E. Kimbark MacColl, Jr. and VavRosky, MacColl, Olson, Busch & Pfeifer, P.C.

David L. Runner, Appellate Counsel, filed a brief *amici curiae* for SAIF Corporation and South Hills Health Care Center.

Before Deits, Chief Judge, and Edmonds, De Muniz, Landau, Haselton, Armstrong, Linder, Wollheim and Kistler, Judges, and Warren, Senior Judge.

LINDER, J.

Edmonds, J., concurring.

De Muniz, J., dissenting.

Wollheim, J., dissenting.

## LINDER, J.

Claimant seeks review of a Workers' Compensation Board (board) order awarding him permanent partial disability (PPD) rather than permanent total disability (PTD). The petition for review raises only one issue: whether the administrative procedures for determining the extent of the permanent disability—in particular, the process for reconsideration and hearing—satisfy the requirements of the federal Due Process Clause. We hold that they do and affirm.

Claimant, who is approximately 60 years old, has a history of extensive temporomandibular joint (TMJ) difficulty, which involves episodic jaw pain and discomfort. He has been medically treated for that condition since at least 1982, and his treatment has included several surgeries. He suffered compensable injuries to his jaw twice, first in 1986 and again in 1989. In 1994, his treating physician declared him to be medically stationary, triggering the claim closure process. As part of that process, three other physicians independently examined claimant to assess the extent of his disability. Their examination included review of a videotape of defendant engaging in certain activities (*e.g.*, mowing his lawn, driving his pickup, chopping wood, and fishing). Based on the videotape and their physical examinations, those physicians concluded that claimant could perform at least sedentary work. Claimant's treating physician also viewed the videotape and agreed that claimant likely could perform certain activities, but he was unsure whether claimant could do so on a daily basis.

The Department of Consumer and Business Services (DCBS) reviewed the medical reports and issued a determination order finding claimant to be medically stationary and awarding him PPD. Claimant requested reconsideration by DCBS, seeking a determination that his disability is total, rather than partial. In requesting reconsideration, claimant did not dispute the impairment findings used to rate the extent of the disability. As a result, DCBS submitted the claim to the Appellate Review Unit (unit) for reconsideration, rather than appoint a medical arbiter to review the rating. In its order on reconsideration, the unit reviewed the physicians' reports and agreed that claimant was only partially

disabled. However, the unit modified the determination by increasing the PPD disability rating pursuant to a temporary rule.[1]

Claimant sought administrative review, invoking his right to a hearing before an administrative law judge (ALJ). Before the hearing, claimant indicated he was prepared to offer his testimony, the testimony of his family physician, and the testimony of a vocational expert "to substantiate claimant's case" and to show "in a convincing manner that claimant is permanently and totally disabled." Claimant could have submitted that evidence by affidavit at the prior level of administrative review (reconsideration), but he made no effort to do so. Because that evidence had not been submitted at reconsideration, the ALJ ruled it inadmissible under ORS 656.283(7).[2] At the hearing, claimant's counsel again asked to present the testimony and asserted a right under the Due Process Clause to do so. The ALJ rejected claimant's due process argument and limited her consideration to the evidence presented at reconsideration and submitted at hearing for the ALJ's consideration. On the basis of that evidence, the ALJ found that claimant was not entitled to PTD. Claimant appealed to the board, asserting that under the Due Process Clause, the proffered testimony should have been considered. The board rejected the constitutional claim and, on *de novo* review of the record, affirmed the ALJ's order.

---

[1] In rating permanent disability cases, temporary rules may be adopted in individual cases where the director finds "that the worker's impairment is not adequately addressed in the disability standards." OAR 436-035-0500. In this instance, on reconsideration, the disability rating changed from 14 to 29 percent unscheduled PPD, with an impairment value of 8, to account for the disabling effects of claimant's episodic jaw pain.

[2] ORS 656.283(7) was amended pursuant to Senate Bill 369, Oregon Laws 1995, chapter 332, section 34, effective June 7, 1995, to provide:

"Except as otherwise provided in this section * * * the Administrative Law Judge is not bound by common law or statutory rules of evidence[.] * * * Evaluation of the worker's disability by the Administrative Law Judge shall be as of the date of issuance of the reconsideration order pursuant to ORS 656.268. Any finding of fact regarding the worker's impairment must be established by medical evidence that is supported by objective findings. * * * *Evidence on an issue regarding a * * * determination order that was not submitted at the reconsideration required by ORS 656.268 is not admissible at hearing*[.]'"

(Emphasis added.)

At the outset, it is helpful to clarify the precise legal challenge that claimant makes. Claimant asks us to declare invalid the 1995 amendment to ORS 656.283(7), which bars the admission of evidence at an ALJ hearing that was not presented at the prior stage of administrative review (reconsideration). *Rogue Valley Medical Center v. McClearen*, 152 Or App 239, 952 P2d 1048, *rev den* 327 Or 123 (1998). With that change, determining the extent of an accepted disability under Oregon's workers' compensation statutes is based primarily on the presentation of written medical reports and other documentary and written submissions. There is no point during the administrative closure process at which a claimant, as a matter of right, can orally submit his or her own testimony and the direct testimony of other witnesses.

Claimant wages a facial attack on that administrative structure, contending that it denies a claimant seeking PTD due process of law under the Fourteenth Amendment to the United States Constitution. Claimant briefly canvasses the closure, reconsideration, and hearing procedures, taking issue with the fact that, in light of the amendment to ORS 656.283(7), there is no point during the administrative process at which a claimant receives a trial-type hearing as part of determining the extent of a compensable disability. Claimant concludes by arguing:

> "On balance the claimant's protected interest in permanent total disability benefits entitles him to a trial-type hearing. Such procedural safeguards were not provided at either the reconsideration or hearing level. Consequently, claimant was denied the procedural due process guarantees of the Fourteenth Amendment."

Thus, although claimant's immediate challenge is directed to the limitation on evidence newly imposed by ORS 656.283(7) at the ALJ level, the rationale for the challenge is the failure to provide a trial-type hearing at any point in the PTD determination.

Employer responds that the reconsideration and hearing processes, notwithstanding their evidentiary limitations, adequately protect claimant's due process interests. Employer points out that claimant had the opportunity to present his full case by written reports and affidavits at the

reconsideration level, but that claimant chose not to avail himself fully of that opportunity. Additionally, employer observes that, at the hearing before the ALJ, claimant could have cross-examined the author of any written vocational report, pursuant to ORS 656.287(1), as long as that report was presented at reconsideration. All of those procedures provide, in employer's view, meaningful opportunities to contest the relevant issues and adequately ensure the reliability of the decision.

■ The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." The question of what process constitutionally is due involves three inquiries: (1) whether the person invoking the due process claim has a constitutionally protected interest in the particular benefit at stake; (2) whether deprivation of that interest involves government action; and (3) whether the procedures used or available are constitutionally adequate. *See generally Carr v. SAIF*, 65 Or App 110, 117-18, 670 P2d 1037 (1983), *rev dismissed* 297 Or 83 (1984).

■ The parties do not dispute that an injured worker has a protected property interest in a determination of PTD status and that denial of that status involves government action. *See id.* at 118.[3] The only issue, then, is the constitutional adequacy of the administrative procedures provided by state law to determine a claimant's entitlement to PTD benefits. As the United States Supreme Court has observed: "[O]nce it is determined that the Due Process Clause applies, 'the question remains what process is due.' " *Cleveland Bd. of Educ. v. Loudermill*, 470 US 532, 541, 105 S Ct 1487, 84 L Ed 2d 494 (1985) (quoting *Morrissey v. Brewer*, 408 US 471, 481, 92 S Ct 2593, 33 L Ed 2d 484 (1972)).

■ Fundamentally, the question posed by a procedural due process challenge is whether, given what is at stake, the

---

[3] Our conclusions in *Carr* that workers' compensation benefits involve government action and protected property interests have been drawn into doubt by the United States Supreme Court's recent opinion in *American Mfrs. Mut. Ins. Co. v. Sullivan*, ___ US ___, 119 S Ct 977, 143 L Ed 2d 130 (1999). However, the parties in this case have assumed *Carr's* correctness and have not raised and briefed those points. Given our rejection of the due process challenge, we need not consider *Sullivan's* implications for this case.

procedures used to reach that decision provide sufficient confidence in the decision made. *Mathews v. Eldridge*, 424 US 319, 335, 96 S Ct 893, 47 L Ed 2d 18 (1976), frames the analysis as a three-part balancing test:

"[F]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."

■ The private interest at stake here is claimant's entitlement to PTD versus PPD benefits. PTD benefits serve as replacement wages for a worker who, due to the disabling effects of a compensable injury, permanently cannot return to regular and suitable gainful employment. ORS 656.206(2)(a). We recognized in *Carr* that temporary total disability (TTD) benefits, which compensate an injured worker on a temporary basis for the same inability to work, represent a significant interest to a claimant. Specifically, "[d]eprivation of compensation, even for a relatively brief period of time, and the resulting possible loss of ability to acquire essential goods and services, may threaten the health and safety of the worker and his dependents." *Carr*, 65 Or App at 121. PTD benefits, if awarded, replace TTD benefits when a claimant becomes medically stationary. In a case such as this, however, the difference is not between full wage replacement and no wage replacement at all, but rather is between full wage replacement and partial wage replacement, both on a permanent basis. Even so, a claimant's interest in PTD benefits is significant and a deprivation can have important consequences, as in *Carr*.[4]

---

[4] Judge De Muniz's dissent characterizes the potential loss of PTD benefits as "much more grievous" and deserving of "significantly more procedural protection" than the loss of TTD benefits in *Carr*. 159 Or App at 254 (De Muniz, J., dissenting) With all respect, at some point the argument invites judicial hair-splitting, because the gradations in seriousness cannot be assessed or quantified meaningfully. Comparing the inquiry here to that in *Carr* illustrates the problem. In *Carr*, the claimant risked the loss of an *entire* source of income, albeit for a finite time. Moreover, the TTD decision, once final, was not subject to modification. Here, in contrast, the issue is whether claimant's accepted disabling condition merits full wage replacement or partial wage replacement; that determination, while

Analysis of the second factor from *Mathews* — the risk of an erroneous deprivation and the value of added process — requires first an assessment of the existing claim closure, reconsideration, and hearing processes by which a PTD determination is made, together with the nature of the administrative decision to be made. "Claim closure" is the process for determining the amount of benefits to be awarded on a permanent basis for a claim already accepted as disabling. As a general proposition, claim closure occurs when either the worker or the employer asserts that the worker's disabling condition has become medically stationary, ORS 656.268, unless the worker is actively engaged in a vocational training program. ORS 656.268(1)(c).

Typically, when PTD status is at issue, a worker will not have returned to work and will not have been released by a physician to return to work. In those circumstances, the insurer must ask DCBS to close the claim, rather than do so itself. *See* ORS 656.268(2)(a) and (4)(a). Copies of all medical reports and reports of vocational rehabilitation agencies or counselors must be provided to DCBS. ORS 656.268(2)(b). Medical reports must be in writing and may include, among other items: the history of the injury or disease; other pertinent medical history; date of examination; findings on examination; impairment of physical or mental function; restrictions on activities (such as lifting, bending, twisting, sitting, standing, and repetitive use); likelihood of permanent impairment and opinion as to whether the condition is likely to change; and the reason for the opinion. OAR 438-007-0005(2). Vocational reports may be submitted by consultants employed by governmental agencies or insurers and by private vocational consultants. ORS 656.287(1). Those reports

nominally "permanent," is subject to later modification under some circumstances. *See, e.g.*, ORS 656.273 (worsened conditions); ORS 656.278(5) (authority of insurer to reopen claim to provide greater benefits); ORS 656.206(5) (PTD awards must be reviewed every two years). Because the issue here is a reduced benefit, not a complete denial of one, we are unwilling to consider claimant's interest as "much more grievous" than the claimant's interest in *Carr*. *See* Henry J. Friendly, *Some Kind of Hearing*, 123 U Pa L Rev 1267, 1298 (1975) (suggesting that suspension of benefits should be treated as more serious than their reduction). But neither do we attempt to quantify the unquantifiable by measuring in pounds and ounces how much each of these related interests weighs on the due process scale.

may address job opportunities, a claimant's fitness to perform certain jobs, prevailing wage levels, and other information relating to employability and loss of earning capacity. *Id.*

Upon receipt of relevant medical and vocational information, DCBS within 10 working days must issue a "determination order" finding the extent of the worker's permanent disability as a result of the accepted disabling injury. ORS 656.268(5)(a); OAR 436-030-0030(4). DCBS may postpone issuance of the determination order for up to 60 days if it concludes that additional medical or other information is necessary. ORS 656.268(5)(a).

Either party, or both parties, may request reconsideration of the determination order. ORS 656.268(5)(b) and (6)(a). Reconsideration is performed by a "special evaluation appellate unit" within DCBS, which has 18 days to complete the reconsideration. ORS 656.268(6)(d). If the unit requires additional time, it may delay a decision for 60 days to obtain the needed information. *Id.*

The record on reconsideration consists of documents included at the time of claim closure, together with any additional documents submitted for the reconsideration proceeding. *See generally* OAR 436-030-0155. On reconsideration, the parties are entitled to correct and to clarify information in the record that is erroneous and may submit medical evidence that should have been, but was not, submitted by the treating physician. ORS 656.268(6)(a); OAR 436-030-0115(1). Although the director of DCBS may order otherwise, a reconsideration proceeding typically "does not include personal appearances by any of the parties to the claim or their representatives." OAR 436-030-0115(2). However, the parties are entitled to submit documents encompassing factual information and written arguments relevant to the worker's status at the time of claim closure. OAR 436-030-0115(3). All interested parties must receive copies of those documents. OAR 436-030-0135(1). Information submitted for reconsideration also "may include, but is not limited to, responses to the documentation and written arguments of the opposing

party, written statements and sworn affidavits of the parties." OAR 436-030-0115(3). Thus, reconsideration is performed primarily, if not completely, on the basis of a documentary record, together with written arguments of the parties.

■ If either party is dissatisfied with the order on reconsideration, it may request a hearing under ORS 656.283 before an ALJ. ORS 656.268(6)(g). Except for issues arising out of the reconsideration order, the only issues that may be considered at the hearing are those that were raised and preserved at reconsideration before DCBS. ORS 656.268(8). In certain respects, the hearing is informal. For example, the ALJ is not bound either by common law or statutory rules of evidence, or by technical or formal rules of procedure. ORS 656.283(7). Instead, the hearing is conducted "in any manner that will achieve substantial justice." *Id.* After the 1995 amendment to ORS 656.283(7), however, the scope of admissible evidence in a hearing to close a claim is limited significantly by one criterion: the evidence must have been submitted at the reconsideration level. If that criterion is satisfied, either party at the hearing may subpoena the other party's medical and vocational experts and cross-examine them. If, without good cause, an expert refuses to make himself or herself available for cross-examination, that expert's report is generally excluded from evidence. OAR 438-007-0005(3).[5]

---

[5] Judge Wollheim's dissent takes issue with our observations about the parties' ability under the rule to cross-examine experts on the contents of medical reports, concluding that the rule is invalid because it conflicts with the evidentiary limitations of ORS 656.283(7). 159 Or App at 258 (Wollheim, J., dissenting). Our analysis does not depend on that feature of the hearing process because, as we later explain, the issues lend themselves well to proofs and counter proofs through expert reports and written documentation. Nevertheless, we describe the terms of the rule because, as it stands, the rule *is* part of the available process. As a general proposition, an administrative rule remains an effective statement of existing practice or policy until it is either judicially invalidated or repealed through proper APA procedures. *See Burke v. Children's Services Division,* 288 Or 533, 538, 607 P2d 141 (1980). We are not prepared *sua sponte* to declare it invalid, where, as here, the rule's validity has not been drawn into question. Nor do we share the dissent's confidence that the rule is fatally inconsistent with the statute. Legislative authorization for the rule at least arguably resides in ORS 656.283(7), which authorizes the ALJ to conduct the hearing "in any manner that will achieve substantial justice." We have previously concluded that permitting cross-examination of vocational experts at hearing, as the legislature expressly has done, is not inconsistent with the statute's evidentiary limitations. *McClearen,* 152 Or App at 244-45. The same, at least arguably, may be said of a rule permitting cross-examination of

The substantive decision to be made—whether a claimant is PTD—must be considered against that procedural backdrop. "Permanent total disability" is statutorily defined as "the loss * * * of use or function of any scheduled or unscheduled portion of the body which permanently incapacitates the worker from regularly performing work at a gainful and suitable occupation." ORS 656.206(1)(a). "Suitable occupation" refers to those occupations that exist in a theoretically normal labor market, within a reasonable geographic distance, for which a worker has the training or experience and the realistic ability to perform the job duties, with or without rehabilitation. OAR 436-030-0055(1)(b). Before a worker will be determined to be PTD, the worker must prove that the disability is permanent and total. OAR 436-030-0055(3). If a worker retains "some residual functional capacity and is not medically permanently and totally disabled," the worker must prove, using "competent written vocational" evidence, that he or she is unable regularly to perform work at a gainful and suitable occupation. OAR 436-030-0055(4). If the worker has not made reasonable work search efforts, the worker's burden includes showing the futility of seeking work, again with "competent written vocational" evidence. *Id.* "Competent written vocational" evidence consists only of the opinions of persons fully certified by the State of Oregon to render vocational services and does not include opinions by claimants, physicians, or others not certified. *Id.*

Several important observations follow from the description of the procedures relevant to PTD status and the standards for the decision to be made. First, PTD status is an intensively medical and vocational issue, one that lends itself particularly to expert opinion. Second, a claimant seeking to establish PTD status is entitled to present information from every relevant source at the reconsideration stage. That is, the claimant may present the relevant opinions of experts, lay witnesses, and himself or herself on issues relating to the extent of impairment and loss of earning capacity. Third, and finally, the procedural limitations that attend to the PTD decision are ones of form, not substance. The procedures call for exploration of the medical and vocational issues through

medical experts at hearing, if the expert's report was submitted at reconsideration.

reports, affidavits, written argument, and written response. Unlike a traditional trial-type hearing, the process does not involve live testimony of witnesses, with the exception of cross-examination of vocational and medical experts on the substance of their reports and opinions.

Claimant's primary contention is directed to the second *Mathews* factor—*i.e.*, the contention that the reconsideration process produces a substantial risk of erroneous PTD determinations. Claimant argues that the "[l]imitations on what can be considered for reconsideration virtually preclude claimant from thoroughly presenting, rebutting or cross-examining evidence." In this particular case, claimant declined the opportunity to present his case fully at reconsideration, where he could have offered his own testimony, as well as that of his family physician and a private vocational counselor, in the form of affidavits, reports, or other documentary evidence. As we understand claimant's position, his point is that, as a matter of due process, he is entitled to forgo presenting written evidence at the reconsideration level and then insist on presenting it for the first time through live witnesses before the ALJ.

■ As a threshold matter, we fail to understand how the limitations on the form of evidentiary submissions at reconsideration can excuse presentation of that evidence at that level. Even assuming that claimant is correct and that he is entitled, at the hearing, to produce witnesses for direct and . cross-examination before the decisionmaker, that does not mean that he may deliberately bypass written presentation of the evidence to DCBS for consideration in making its administrative decision on reconsideration. The statutory scheme reflects a legislative policy of requiring the parties to come forward with all issues that they intend to raise and all information that bears on those issues for meaningful consideration by the agency charged with the administrative decision. *See* ORS 656.268(7)(g) (no post-reconsideration evidence of medical impairment is admissible); ORS 656.268(8) (no hearing shall be held on any issue not raised and preserved before DCBS at reconsideration); ORS 656.283(7) (issues regarding claim closure cannot be raised at hearing if not raised before DCBS; evidence on issues not presented at

reconsideration is not admissible at hearing).[6] Claimant cites no authority, nor are we aware of any, for the proposition that a person seeking an administrative benefit is entitled to withhold information bearing on the claim at lower administrative levels on the theory that later levels of administrative review either will or must involve live testimony rather than written submissions.

■ In all events, we disagree that due process requires more procedural protection than the administrative structure for reconsideration and hearing provides.[7] As the United States Supreme Court has emphasized, due process " 'is not a technical conception with a fixed content unrelated to time, place and circumstances,' " *Cafeteria Workers v. McElroy*, 367 US 886, 895, 81 S Ct 1743, 6 L Ed 2d 1230 (1961) (quoting *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 US 123, 162, 163, 71 S Ct 624, 95 L Ed 817 (1951) (Frankfurter, J., concurring)), but instead flexibly "calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 US 471, 481, 92 S Ct 2593, 33 L Ed 2d 484 (1972). Claimant's challenge flows from his predicate assertion that the procedures afforded him do not provide a "trial type hearing on adjudicative facts." The argument assumes, incorrectly, that adjudicative procedures are an all-or-nothing proposition—that is, that they either are a mere

---

[6] Testimony in support of the 1995 amendments to ORS 656.283(7) is replete with expressions of concern that "the issues be raised at the lowest possible level for resolution" and that the record under review "be the same at all levels of appeal." *See, e.g.*, Tape Recording, House Committee on Labor, SB 369, March 8, 1995, Tape 48A (testimony of Virlena Crosely, Workers' Compensation Division Administrator). *See generally In re Ray*, 48 Van Natta 325 (1996) (reciting at greater length the legislative history of the 1995 amendment to ORS 656.283(7)).

[7] We reach the constitutional question, as did the ALJ and the board, notwithstanding claimant's failure to present the proffered testimony in documentary form at reconsideration. We do so because the 1995 amendments to ORS 656.283(7) took effect after claimant requested reconsideration and the reconsideration process had commenced. At hearing, claimant challenged whether the requirement of presenting the evidence at reconsideration could be applied retroactively to him. He abandoned that challenge at the board level and has abandoned it before this court. Thus, that issue is not before us. But because the statute was not in effect when reconsideration commenced, we do not resolve this case on the narrow ground that claimant was obligated to present the proffered evidence in documentary form at reconsideration before he may, through live testimony or otherwise, insist on presenting it at the ALJ hearing.

opportunity to comment and be heard or are full-blown evidentiary contests, complete with direct and cross-examination.

■ To the contrary, as the United States Supreme Court has cautioned, in reiterating what it referred to as the "wise admonishment" of Justice Frankfurter, "differences in the origin and function of administrative agencies 'preclude wholesale transplantation of the rules of procedure, trial and review which have evolved from the history and experience of courts.' " *Mathews*, 424 US at 348 (quoting *FCC v. Pottsville Broadcasting Co.*, 309 US 134, 143, 60 S Ct 437, 84 L Ed 2d 656 (1940)). The fact that the transplant is not wholesale does not mean that the process is not adjudicative or adversarial. Nor does it mean that the decision is necessarily less reliable: "The judicial model of an evidentiary hearing is neither a required, nor even the most effective, method of decisionmaking in all circumstances." *Id.* In short, due process is not a one-size-fits-all principle that requires full-blown, trial-type procedures wherever anything more than a mere opportunity for comment is needed.

Although the procedures for reconsideration and ALJ review do not model judicial trial procedures, they offer a meaningful process for adjudicating facts contested by the parties. It is worth emphasizing that, at the point of closure, the compensability of the injury and the fact that it is permanently disabling have been established. Only the *extent* of the disability remains to be determined. DCBS's initial extent determination is made on the basis of medical and vocational reports that, by the time of claim closure, frequently will have involved many years' worth of professional assessment and treatment of a claimant's work-related injury and accompanying disability.[8] At the reconsideration phase, a claimant has the opportunity to take issue with the initial determination order and to submit written documentation, both medical and vocational, to correct and clarify the record. The employer may do the same. A claimant also can present lay testimony by affidavit. Both parties are entitled

---

[8] By way of illustration, the record before DCBS in this case contained nearly 13 years' worth of medical, vocational, and psychiatric assessments relating to claimant's disability.

to present written argument and to respond in writing to each other's submissions. Thus, the process is adversarial and permits affirmative proofs, counter proofs, and written argumentation. As the board accurately observed:

"Taken together, the reconsideration procedures enabled claimant to present in writing the lay, medical and vocational evidence supporting his entitlement to PTD benefits. That is, claimant had the opportunity to present essentially the same evidence on reconsideration [that] he sought to present at hearing, albeit in somewhat different form. The substance of any lay and/or expert witnesses' testimonies could have been presented by sworn affidavits at the time of reconsideration. In this regard, we reject claimant's argument that oral testimony was necessary for him to establish he was willing to seek employment and made reasonable efforts to obtain such employment; that evidence could have been presented by affidavit at reconsideration. The evidentiary limitation in *amended* ORS 656.283(7) is on the form and timing, not the substance, of the evidence relevant to the PTD issue."

In *Mathews,* the Supreme Court was confronted with a nearly identical constitutional challenge in the context of social security disability benefits, where the benefit decision turned on whether a potential recipient was "disabled." 424 US at 343-45. The court rejected the idea that medical evidence and evaluation could be meaningfully presented and tested only through direct and cross-examination of live witnesses, concluding instead that written submissions by physicians were at least as reliable, if not more so.[9] The Court

---

[9] The Court concluded:

"[T]he decision whether to discontinue disability benefits will turn, in most cases, upon 'routine, standard, and unbiased medical reports by physician specialists,' *Richardson v. Perales*, [402 US 389, 404, 91 S Ct 1420, 28 L Ed 2d 842 (1971)], concerning a subject whom they have personally examined. In *Richardson* the Court recognized the 'reliability and probative worth of written medical reports,' emphasizing that while there may be 'professional disagreement with the medical conclusions' the 'specter of questionable credibility and veracity is not present.' [*Id.* at 405]. To be sure, credibility and veracity may be a factor in the ultimate disability assessment in some cases. But procedural due process rules are shaped by the risk of error inherent in the truthfinding process as applied to the generality of cases, not the rare exceptions. The potential value of an evidentiary hearing, or even oral presentation to the decisionmaker, is substantially less in this context than in [the context of welfare benefits]."

*Mathews*, 424 US at 343-45 (footnote omitted).

then acknowledged that the question of disability does not always turn solely on a medical diagnosis, but also frequently depends on nonmedical factors such as age, education, work experience, and the ability to find gainful employment. On the issue of employability, the Court similarly concluded that the live examination of witnesses would not meaningfully aid the decision:

> "The value of an evidentiary hearing, or even a limited oral presentation, to an accurate presentation of those factors to the decisionmaker does not appear substantial. Similarly, resolution of the inquiry as to the types of employment opportunities that exist in the national economy for a physically impaired worker with a particular set of skills would not necessarily be advanced by an evidentiary hearing. * * * The statistical information relevant to this judgment is more amenable to written than to oral presentation."

*Id.* at 344 n 28 (citation omitted).

The same conclusion follows here. The "essence" of due process is to provide a person in jeopardy of serious loss notice of the case against him and an opportunity to meet it. *Id.* at 348. Those values are amply served by the procedures in place for claim closure. Claimant's due process challenge is to *the form* of claimant's evidence (*i.e.*, affidavit versus oral examination), not whether the decisionmaker has access to whatever relevant information the claimant wants to provide. Because the disability determination is directly driven by medical and vocational inquiries, an evidentiary hearing with live witnesses would not significantly advance the decision, nor does its absence subject the reliability of the outcome to an unacceptable risk of error.

■■ Claimant argues that *Mathews* is distinguishable, because there the Court was addressing the procedures followed for an initial determination of social security benefits in the context of a scheme that gave the applicant a later, more trial-type adversarial hearing. We acknowledge that difference and that the decision in *Mathews* therefore is not controlling, despite its close parallels to this case. But we cannot so readily discount the substance of the Court's discussion, which emphasized the minimal and incremental benefit of live witness testimony given the nature of the decision to

be made. As the Supreme Court has cautioned, "[p]rocess is not an end in itself." *Olim v. Wakinekona*, 461 US 238, 250, 103 S Ct 1741, 75 L Ed 2d 813 (1983). If the process sought does not meaningfully advance the decision to be made—and we conclude that it would not here—the Due Process Clause does not require it.[10]

Claimant finally contends that issues peculiar to some PTD determinations, such as employability and willingness to work, place a claimant's credibility uniquely at issue and require, as a constitutional matter, that a claimant be permitted to testify. *But see Califano v. Yamasaki*, 442 US 682, 696-97, 99 S Ct 2545, 61 L Ed 2d 176 (1979).[11] The dissenting opinions agree, urging that in so-called "odd lot" cases, a claimant may remain capable of performing some kind of work, but be totally disabled because a combination of medical and nonmedical factors forecloses him or her from gainful employment in a realistic job market. The dissenting opinions urge that in those cases, a claimant's credibility

---

[10] To illustrate the importance of cross-examination, Judge De Muniz's dissent urges that claimant should have been permitted to cross-examine witnesses about the surveillance video of defendant's activities. 159 Or App at 255 (De Muniz, J., dissenting). Due process procedures are shaped by the risk of error in the general case to be decided, not by the value of the procedure in a particular case. *See post* 159 Or App at 248. Even so, the dissent's point is not well taken. Claimant did not share the dissent's concerns about the videotape and never suggested by his offer of proof that he wanted or needed to examine anyone about it. Nor does claimant make that argument on appeal.

[11] Even if credibility were more of a key to the PTD determination, *Califano* suggests that the procedures provided would be ample. In *Califano*, the Supreme Court distinguished between the procedures required for recoupment of social security payments under different provisions of the social security statutes. Where the recoupment is based on matters of computation (even the recipient's own errors), the court held that no oral hearing whatsoever is required, because credibility is involved only rarely in such cases. *Califano,* 442 US at 696. On the other hand, where a recipient sought to have the recoupment waived on the basis of the recipient's lack of "fault," the Court determined that credibility is central to the waiver, and therefore some form of oral hearing is required. *Id.* at 697. Significantly, the oral hearing the Supreme Court envisioned was a far cry from the trial-type procedures that claimant demands here. The Court approved administrative rules providing only for " 'a short personal conference with an impartial employee of the Social Security Administration.' " *Id.* (quoting from the respondent's brief). *See generally Gray Panthers v. Schweiker*, 716 F2d 23 (DC Cir 1983) (where credibility was central to administrative decision, oral hearing but not full trial procedures required). Here, a claimant is present and receives an oral hearing before the decisionmaker.

takes on a special role. As a result, nothing less than live witnesses, complete with direct and cross-examination, will do. *See* 159 Or App at 252-53 (De Muniz, J., dissenting); 159 Or App at 259 (Wollheim, J., dissenting).

In responding to that contention, the starting point is to recognize that so-called "odd lot" cases are a subclass of the universe of cases decided pursuant to the procedures that claimant challenges. Claimant here has made a *facial* challenge to the statute. The crux of that challenge is that a trial-type hearing is required at the hearing level for *all* closure determinations, including those involving only medical issues.[12] Unlike the inquiry in, for example, an unemployment case,[13] credibility is not directly at stake in PTD determinations generally, at least not in any demonstrable way. Before claim closure, the worker already has been determined to be compensably disabled. The question at closure is only the extent of that compensable disability. Thus, a PTD determination hinges largely on medical evidence concerning the degree of disability and on vocational evidence regarding the nature of the work that can be performed, given medical limitations. That fact is underscored by the aggressive program of vocational rehabilitation offered to injured workers, using professionals specially certified by DCBS, and involving vocational evaluation, physical capabilities evaluation, general vocational assistance, and help in directly obtaining employment and training. *See generally* ORS 656.340.

Even as to "odd lot" cases, however, neither claimant nor the dissenting opinions satisfactorily demonstrate the

---

[12] Indeed, that is the only challenge that claimant preserved. At the hearing, claimant sought to introduce testimony of direct witnesses (himself, his personal physician, and a vocational counselor) "to substantiate claimant's case." He made no offer of proof as to what those witnesses would say. Claimant's request to call witnesses and present direct testimony at hearing was adequate to preserve the issue of whether he is entitled, as a legal matter, to a "trial-type" hearing. *See State v. Olmstead*, 310 Or 455, 461, 800 P2d 277 (1990) (where entire class of evidence is excluded as a legal matter, party need not make a specific offer of proof to preserve argument of legal entitlement to have decision based on such evidence). But if the argument is that particular *substance or content* of the testimony requires the evidentiary limitations of the statute to give way, no such claim has been presented or preserved in this case.

[13] *See, e.g., Thompson v. Employment Division*, 82 Or App 75, 727 P2d 158 (1986) (remanding to administrative factfinder for credibility findings on availability for work because the issue was central to the decision to be made).

extent to which the PTD determination turns on a claimant's credibility or that the credibility assessment cannot be made reliably without live testimony. To make the case for the importance of live testimony, the argument must be not only that credibility is central to the decision, but that a *demeanor-based* credibility determination is essential to the integrity of the determination. To be sure, personal demeanor provides insight into credibility, especially when the dispute involves competing versions of historical facts, such as two witnesses' differing memories of an event.[14] That reality leads appellate courts generally to defer on credibility matters to factfinders who had the opportunity to "see and hear" the witness testify. *E.g., Good Samaritan Hospital v. Employment Div.*, 104 Or App 241, 243, 799 P2d 1141 (1990). However, as Judge Richardson aptly observed some years back, demeanor is only one of many considerations that *may,* in a given case, bear on the weight to give to a witness's statements; meaningful credibility assessments can be and often are made on the basis of written evidence alone:

> "[I]f the conclusion is that [a decisionmaker] cannot make credibility findings because he has not observed the witnesses testifying, the simple answer is that credibility (more properly weight) is determinable from a number of factors other than witness demeanor. The credibility, *i.e.,* weight, that attaches to testimony can be determined in terms of the inherent probability, or improbability of the testimony, the possible internal inconsistencies, the fact it is or is not corroborated, that it is contradicted by other testimony or evidence and finally that human experience demonstrates it is logically incredible."

*Lewis and Clark College v. Bureau of Labor*, 43 Or App 245, 256, 602 P2d 1161 (1979), *rev den* 288 Or 667 (1980) (Richardson, J., concurring in part, dissenting in part) (responding

---

[11] Where credibility is concerned, the value of demeanor evidence may be overrated. Some empirical studies suggest that the observation of demeanor diminishes rather than enhances the accuracy of credibility judgments. *See generally* Olin Wellborn, *Demeanor*, 76 Cornell L Rev 1075 (1991). For present purposes, we do not need to take sides in that debate. It should be enough to observe that classic credibility contests are those in which two individuals relate competing accounts of an historical event and there is no record of the event except their memories.

to the suggestion of Buttler, J., concurring, that commissioner improperly assessed credibility of witnesses in her review of record of contested case hearing).

Although claimant and the dissenting opinions assert that credibility—presumably, demeanor-based credibility—is "crucial" to assessing a claimant's willingness to work, saying that does not make it so. An examination of the relevant inquiry, as outlined by the statutes and administrative rules, does not bear out the point. That examination suggests, instead, that the reports, experience, and opinions of medical and vocational professionals are far more fundamental to determining the extent of a compensable disability. Nor does case law in the area reflect that demeanor-based credibility assessments are the centerpiece of most PTD determinations. Few cases suggest that the PTD determination typically turns on credibility generally. *No* case yet has been cited, and we have not found one, where the claimant's *demeanor* was noted as an important factor to the PTD determination. Were demeanor assessments as crucial to the overall PTD determination as claimant and the dissents suggest, the many years of litigation in this area would reveal as much. The reported cases suggest just the opposite, however.[15] In all events, the cases do not demonstrate that demeanor-based credibility assessments are important in the "generality of cases," which is the due process standard that must be satisfied. *Mathews*, 424 US at 344 ("procedural due process rules are shaped by the risk of error inherent in the

---

[15] Of the large number of reported PTD cases, an occasional one may turn on the injured worker's willingness to seek suitable work. *E.g., Sinclair v. Champion International Corp.*, 117 Or App 515, 844 P2d 933 (1992); *Janish v. Lane Co. S-D #45*, 106 Or App 218, 806 P2d 1164 (1991); *SAIF v. Beswick*, 104 Or App 494, 802 P2d 82 (1990); *SAIF v. Orr*, 101 Or App 612, 792 P2d 454 (1990); *Gornick v. SAIF*, 92 Or App 303, 758 P2d 401 (1988). But the reported cases do not suggest that a demeanor-based assessment of a claimant's credibility has often or generally been needed. To the contrary, judging from our reported decisions of the last several years, of the few cases in which willingness to work was even a central issue, the determination generally was based on objective information as to a claimant's age, physical limitations, education level, and the nature of the job market *E.g., Gornick*, 92 Or App at 308. Similarly, vocational, medical, and psychiatric evidence is often determinative, even when the issue turns on a claimant's motivation and attitude. *E.g., Sinclair*, 117 Or App at 517-18. Cases in which a claimant's credibility and veracity are the be all and end all of the issue appear to be rare at best; indeed, neither claimant nor the dissents cite a single case in which a claimant's credibility was determinative.

truthfinding process as applied to the generality of cases, not the rare exceptions").

Nevertheless, one of the dissenting opinions urges, with eloquence and empassioned conviction, that injured workers simply must have the opportunity at some point to "look into the face of an impartial adjudicator and tell their stories." 159 Or App at 262 (Wollheim, J., dissenting). The dissent offers no particular clarification of the substance of what is to be related or any precise explanation of why a live recounting is so important. Without that, the argument reduces to one urging process for the sake of process, not for the sake of reducing the risk of error. Lost in the dissent's overview of more than eight decades of changes in the workers' compensation system is an acknowledgment that the inquiry in a PTD determination is a narrow one. Fault is no longer at issue in compensating injured workers. For that matter, even compensability and disability are settled at the point of closing and rating an accepted claim. Only the *extent* of disability remains to be determined. In an odd-lot case, a claimant may be able to relate facts relevant to whether the claimant has engaged in a search for suitable work or, if not, why that search would be futile. It is not obvious, however, why facts of that nature cannot be communicated effectively though affidavits and written documentation. Nor does the dissent supply the answer. The dissent's plea for "simple justice" through the "telling of one's story" is appealing for its poetic imagery. But it treats process as "an end in itself," when due process analysis requires more. *See Olim,* 461 US at 250.

■ Finally, concerning the third *Mathews* factor—the burden imposed on the government by additional process—we examine the government's interest in the fair and efficient administration of the workers' compensation scheme, which we have recognized as significant. *Carr,* 65 Or App at 123. Claimant argues that because he is entitled to some form of evidentiary hearing before an ALJ, his ability to testify orally and to cross-examine witnesses generally as a matter of right would "not substantially increase either the administrative burden or fiscal impact on the government." Even if the costs of allowing claimant to present live witnesses would be minimal, we are not convinced that the added procedural benefit

is required, given our conclusion that an oral presentation of direct testimony, or a general right of cross-examination, is not of substantially greater value than proof and counterproof through written reports and affidavits.[16] More to the point, we do not agree that the costs are as *de minimis* as claimant suggests. Evidentiary hearings with the personal appearance of witnesses involve scheduling burdens and consume time and resources. The exact financial and efficiency costs may be difficult to estimate. However, "experience with the constitutionalizing of government procedures suggests that the ultimate additional cost in terms of money and administrative burden would not be insubstantial." *Mathews*, 424 US at 347. Likewise, here, the burden would be real.

Judge De Muniz's dissenting opinion asserts that there has never been a significant complaint about the cost of providing trial-type hearings at the ALJ level, but it cites nothing to support that statement. 159 Or App at 256 (De Muniz, J., dissenting). Actually, neither the dissent nor we know what the budget impact of those hearings has been or the extent to which they have been a fiscal concern. But more important, the cost to be considered is not just cost at the ALJ level. The legislature restricted evidence at the ALJ level to ensure that issues be raised before DCBS to give it the full benefit of the parties' proofs and arguments as part of its administrative review. *See* n 6 below. The governmental goals, thus, include administrative accuracy, efficiency, and

---

[16] It is worth noting, again, that the statutes and rules currently permit parties to cross-examine experts who have submitted written medical and vocational reports. Beyond that, as to a general right of cross-examination, Judge Friendly's observations are apt:

"[O]ne must query [the relative value of cross-examination] to the thousands of hearings on welfare, social security benefits, housing, prison discipline, education, and the like which are now held every month—not to speak of hearings on recondite scientific or economic subjects. In many such cases the main effect of cross-examination is delay—an argument not really answered, as any trial judge will confirm, by the easy suggestion that the hearing officer can curtail cross-examination. Lawyers, including those who have gone on the bench, have a vivid recall of the few instances where they destroyed a dishonest witness on cross-examination and forget those where their cross-examination confused an honest one or was ineffective or worse—not to speak of the many cases when they had the good judgment to say 'No questions.'"

Friendly, U Pa L Rev at 1284-85.

reduced cost, by removing the incentive to seek an ALJ hearing for the opportunity to try the case anew on the basis of new and different evidence. The goal also is to preserve the integrity of the process, both by ensuring a more complete process at the DCBS level and by not treating ALJ "review" as an opportunity to blindside parties with changed proofs. Those interests are both legitimate and weighty, even if they cannot be measured easily in dollar amounts and do not reflect concerns about dollars alone.

Given the procedures in place—which allow for wide-ranging documentary proofs, counter proofs, and other responsive submissions—and balancing the low value of oral testimony and the burden of trial-type administrative process, we conclude that due process principles do not entitle a claimant to present evidence through in-hearing testimony rather than through written reports and sworn affidavits. Claimant received constitutionally adequate procedural protections under the existing scheme.

Affirmed.

**EDMONDS, J.,** concurring.

Under the applicable statutory and administrative rule scheme, the only issues on which demeanor-based credibility could be crucial in the determination of permanent total disability are the issues under ORS 656.206(3).[1] As to those issues, claimants have the opportunity to meet the burden imposed by the statute by submitting affidavits, including their own, on reconsideration. Under ORS 656.283(7), the administrative law judge "may conduct the hearing in any manner that will achieve substantial justice." It is evident that the legislature contemplated a process whereby any inadequacy, such as an insufficient record arising from the restriction of evidence through affidavits to determine credibility, could be addressed at the hearing level. In that light, ORS 656.283(7) meets general due process standards. That

---

[1] ORS 656.206(3) provides:

"The worker has the burden of proving permanent total disability status and must establish that the worker is willing to seek regular gainful employment and that the worker has made reasonable efforts to obtain such employment."

does not mean, in my view, that in a particular case, a claimant could not make a successful "as applied" challenge if denied the ability to meaningfully controvert an adverse credibility finding after the reconsideration process and if denied the protection of the statute.

For this reason, I concur with the majority opinion.

Warren, S. J., joins in this concurrence.

**DE MUNIZ, J.,** dissenting.

In 1995, the Oregon Legislature amended ORS 656.283(7) to limit the evidence that may be considered by an administrative law judge (ALJ) to evidence submitted at the reconsideration phase of the claim determination process. Claimant contends that the amended statute denies due process to workers seeking permanent total disability (PTD) benefits because there is no meaningful opportunity, at any point in the claim determination process, to present live testimony or rebuttal evidence or to cross-examine witnesses. The majority appears to hold that due process is satisfied because, in its view, PTD determinations turn mainly on medical facts and that written submissions generally used at the reconsideration phase are a meaningful way to present such facts. However, workers seeking PTD benefits also have the additional burden of proving a willingness to work and that they have made a reasonable attempt to obtain employment. The burden of proof that a worker must carry on those issues will, for the most part, turn on an evaluation of the worker's credibility. In the context of the workers' compensation system, that kind of evaluation should be made only in an adjudicative hearing. Additionally, claimant here was denied PTD benefits, in part, on the basis of medical reports that relied on a surveillance video. In my view, written submissions by a worker at the reconsideration phase are not a meaningful or sufficient way for a worker to dispute or neutralize the effect of that kind of nonmedical hearsay. I dissent because denying injured workers an adjudicative hearing in which an ALJ evaluates all of the evidence, including the worker's demeanor and veracity, violates the worker's right to due process of law.

The commonly stated fundamental requirements of due process are notice and the opportunity to be heard at a meaningful time and in a meaningful manner. *State ex rel Juv. Dept. v. Geist*, 310 Or 176, 189-90, 796 P2d 1193 (1990). The question here is whether evidence, generally in written form at the reconsideration phase, allows a worker to be heard in a meaningful manner. As the majority correctly states, the framework for answering that question is the balancing test formulated in *Mathews v. Eldridge*, 424 US 319, 335, 96 S Ct 893, 47 L Ed 2d 18 (1976). On one side of the balance is the value of the private interest at stake and the probability that additional safeguards will reduce the risk of an erroneous deprivation of that interest. On the other side is the government's interest and the cost of the additional safeguards proposed. *See State ex rel Schrunk v. Metz*, 125 Or App 405, 416-18, 867 P2d 503 (1993) (deciding that prompt post-seizure hearings are needed to protect an ownership interest in commercial property).

The majority's application of the *Mathews* test is technically correct. The majority finds that claimant has a protected interest in the determination of PTD benefits but that the existing procedures restricting evidence to that considered at the reconsideration phase present a low risk that claimant will be deprived erroneously of that interest. It then balances those factors against the government's interest in the fair administration of disability benefits and the cost of additional safeguards, which it characterizes as not insubstantial. My disagreement with the majority centers on the weight given to the first two factors. In my view, the majority undervalues both the significance of claimant's interest in PTD benefits and the risk of an erroneous deprivation under the existing procedures.

As to the first factor, the majority determines that the value of claimant's interest in PTD benefits is similar to a protected interest in uninterrupted temporary total disability (TTD) benefits because a denial of either would threaten claimants' health and safety. *Carr v. SAIF*, 65 Or App 110, 120, 124, 670 P2d 1037 (1983), *rev dismissed* 297 Or 83

(1984).[1] The majority then suggests that the significance of claimant's interest is diminished by his receipt of a PPD award. I disagree with the majority's reasoning. The significance of claimant's interest in a PTD determination is unrelated to his PPD award[2] and, instead, should be measured by the extent to which a failure of due process would condemn claimant to suffer grievous loss. *Goldberg v. Kelly*, 397 US 254, 262-63, 90 S Ct 1011, 25 L Ed 2d 287 (1970).

The comparative value of the interests at stake in *Carr* and here are apparent in the plain meaning of the words temporary and permanent. A temporary interruption of TTD benefits for a worker who may return to work, although significant, is less important than a permanent denial of PTD benefits for a worker who may never return to work. In *Carr*, the Department was required to provide the claimant with notice, the basis for a suspension of benefits, and an opportunity to respond either orally or in writing. 65 Or App at 124. Minimal due process was required in *Carr* because the claimant faced only a maximum interruption in benefits of six weeks. *Id.* at 120. However, a permanent denial of PTD benefits, which is the case here, is a much more grievous loss and, accordingly, deserves significantly more procedural protection. The majority fails to appreciate the magnitude of the interest at stake here and, thus, fails to accord claimant's interest sufficient weight in the balancing process.

As to the risk that a worker will be deprived erroneously of a protected interest, the majority reasons that the process due a worker should be shaped by the nature of the determination to be made. Accordingly, the majority reasons that the safeguards of live testimony, rebuttal evidence, and cross-examination are unnecessary because PTD determinations turn primarily on medical and vocational facts and that

---

[1] Recently, the Supreme Court issued a decision that calls into question the validity of *Carr. American Mfrs. Mut. Ins. Co. v. Sullivan*, ___ US ___ , 119 S Ct 977, 143 L Ed 2d 130 (1999). However, the parties here did not dispute that the denial of permanent total disability benefits involves government action. 159 Or App at 234.

[2] In *Mathews*, the Supreme Court commented that "[e]ligibility for disability benefits is * * * *wholly unrelated* to the worker's income or support from many other sources such as * * * *workmen's compensation awards*[.]" 424 US at 340 (emphasis added).

written reports submitted as part of the reconsideration process are a meaningful way to present those kinds of facts. I do not agree with the majority's characterization of PTD determinations as sterile proceedings devoid of emotional content in which credibility determinations are not crucial to the fair determination of a claim. ORS 656.206(3) requires a worker to prove not only permanent total disability (medical facts) but also a willingness to seek regular gainful employment and that reasonable, though unsuccessful, efforts have been made to attain such employment. In the absence of that evidence, a claimant's case for PTD benefits cannot succeed. Carrying the burden of proof on the latter two requirements will depend, for the most part, on a calculation of the worker's veracity.

In *Mathews*, the Supreme Court stated that, where credibility and veracity are important to the generality of cases, " 'written submissions are a wholly unsatisfactory basis for decision.' " 424 US at 344 (quoting *Goldberg*, 397 US at 269). We should not ignore that admonition here. Only by allowing the ALJ to observe a claimant's credibility and veracity first hand and on the record is there an assurance of reliability necessary to satisfy the dictates of due process.

The risk of an erroneous deprivation of benefits is also heightened by the evidence used in this case. As noted above, the majority asserts that PTD determinations turn primarily on medical facts. Yet, here, the Department's finding of residual functional capacity in the reconsideration proceeding is based on medical reports prepared by doctors who viewed a surveillance video of claimant—a form of nonmedical hearsay. *Libett v. Roseburg Forest Products*, 130 Or App 50, 52, 880 P2d 935 (1994), *rev den* 320 Or 507 (1995). Concededly, the ALJ would also not be bound by the rules of evidence under ORS 656.283(7). However, the Department's reliance on the doctors' review of nonmedical hearsay is too far attenuated from claimant's constitutional right to confront witnesses against him. The result is a substantial risk of an erroneous deprivation of claimant's protected interest. The opportunity to cross-examine witnesses on the record would allow claimant to establish critical facts such as when the video was made, how it was edited, who appears in the video, and the context of the activity filmed—facts claimant

could not have meaningfully challenged at the time of reconsideration.

The remaining task is to balance the risk that a claimant will be deprived erroneously of a significant protected interest in PTD benefits against the government's interest and the administrative burden created by the additional safeguards proposed. The majority characterizes the cost of additional safeguards as not insubstantial. That seems an odd conclusion, considering that the system of full adjudicative hearings has operated for years without significant complaint about the cost. In any event, based on my conclusion that, under the current procedures there is a high risk of an erroneous deprivation and that a full adjudicative hearing is necessary to defeat that risk, I would conclude that any significant additional cost is justified.

When life-long benefits are at stake, denying an injured worker the opportunity to have all of the evidence, including the worker's veracity, evaluated in an adjudicative hearing, unfairly distorts the system against the worker so significantly that it violates the worker's right to due process of law.

For the foregoing reasons, I respectfully dissent.

I join in Judge Wollheim's dissent.

Wollheim, J., joins in this dissent.

**WOLLHEIM, J.,** dissenting.

I join in Judge De Muniz' dissent but write separately for two reasons. The first is to articulate my own difficulties with the majority's opinion. The second is to highlight what I perceive to be the systematic erosion of due process rights in Oregon's Workers' Compensation Law.

I take issue with the majority on three points, the first of which is its *ad hoc* application of the three-part balancing test found in *Mathews v. Eldridge*, 424 US 319, 335, 96 S Ct 893, 47 L Ed 18 (1976). The majority acknowledges the difference between *Mathews* and the case at bar, concluding that *Mathews* does not control in this situation. 159 Or App at 244-45. The majority nevertheless deconstructs petitioner's argument using *Mathews* as its primary source. As applied narrowly to this case, I do not believe it is correct for

this court to minimize the application of *Mathews* but then use a select portion of its analysis with no regard for the remaining totality of circumstances in which that analysis applied. At its inception, the *Mathews* test—allocating due process by balancing the private interest affected, the risk of erroneous deprivation *vis-a-vis* the value of additional safeguards, and the government's interest in administrative efficiency—was informed by, and drew its vitality from, the administrative context that necessitated its creation. The majority correctly ascertains that close parallels exist between *Mathews* and the case before us now. 159 Or App at 244-45. Rather than ignoring those parallels, we should compare them and acknowledge that under the *totality* of *Mathews*, we lack, as a threshold matter, many of the components that helped the *Matthews* court ultimately hold that the process in that case was adequate.

In *Mathews*, less process was needed before terminating the petitioner's benefits because of the opportunity for a post-termination evidentiary hearing and judicial review. 424 US at 349. That option does not exist for claimant here. In *Mathews*, the petitioners worked with an "open-file" system that allowed them to submit new evidence at any time and often resulted in additional medical examinations. 424 US at 347. That right also does not exist for claimant here. My point is that if we are to engage in "judicial balancing," then we should employ some standard to which we can refer and, through careful comparison, calibrate our means of measurement, whatever they might be. In this case, if that standard is to be *Mathews,* then by comparison, claimant here begins in a system already heavily weighted against him through paucity of process. And if the standard is to be something other than *Mathews*, then the majority has yet to articulate it.[1]

My second point of contention with the majority's opinion is its characterization of the cross-examination process at hearing. This issue is important because the cross-examination of experts at an extent of disability hearing is a

---

[1] The recent Supreme Court decision in *American Mfrs. Mut. Ins. Co. v. Sullivan*, _____ US _____ , 119 S Ct 977, 143 L Ed 2d 130 (1999), does not alter my objections. In *Sullivan*, as in *Mathews*, the petitioners had the right to a full post-termination evidentiary hearing. Claimant here has no similar right.

critical underpinning of the majority's conclusion. The majority's assumption is that whether an injured worker is permanently totally disabled depends largely on written medical and vocational reports. 159 Or App at 239, 243-44. In order to conclude that these expert reports are reliable, the majority assumes that the experts must be made available for cross-examination at the extent of disability hearing. 159 Or App at 238-39. The majority's conclusion is that due process does not entitle a claimant to orally present evidence at hearing because the determination to be made is based largely on written expert reports, subject to cross-examination. 159 Or App at 246.

The majority is correct that vocational experts can be cross-examined at an extent of disability hearing if the expert's report was submitted at reconsideration. *Rogue Valley Medical Center v. McClearen*, 152 Or App 239, 952 P2d 1048, *rev den* 327 Or 123 (1998). The same, however, cannot be said for medical experts. ORS 656.283(7) provides, in part:

"Evidence on an issue regarding a notice of closure or determination order that was not submitted at the reconsideration required by ORS 656.268 is not admissible at hearing * * *."

*Precision Castparts Corp. v. Plummer*, 140 Or App 227, 231, 914 P2d 1140 (1996), is the first case that considered the limitation on evidence at an extent of disability hearing:

"The unmistakable import of the text of ORS 656.283(7) is that *any* evidence, including a claimant's testimony concerning the notice of closure or reconsideration order, is inadmissible at a subsequent hearing concerning the extent of the injured worker's permanent disability if not submitted at reconsideration and not made a part of the reconsideration record." (Emphasis in original.)

The majority correctly cites OAR 438-007-0005(3), a rule that expressly requires a medical expert submit to cross-examination if that expert's report is submitted at hearing.[2] However, the administrative rule is inconsistent with ORS 656.283(7). While the Board has the authority to interpret

---

[2] It is undisputed that a party has the right to cross-examine a medical expert when the issue is not the extent of disability, *e.g.* at a compensability hearing.

statutory terms, the Board "may not, by its rules, amend, alter, enlarge or limit the terms of a statute." *Cook v. Workers' Compensation Department*, 306 Or 134, 138, 758 P2d 854 (1988). Further, the Board's "authority [to adopt rules] does not include the power to adopt rules that are inconsistent with statutes." *Franzen v. Liberty Northwest Fire Ins. Co.*, 154 Or App 503, 507-08, 962 P2d 729 (1998).

In contrast, the cross-examination of vocational experts exists only because this court held that ORS 656.287(1) created an express exception to ORS 656.283(7). *McClearen*, 152 Or App at 244-45. That outcome helps illustrate why medical expert cross-examination in extent of disability cases is as it is: where there is no statutory authorization and no exception to the evidentiary prohibitions of ORS 656.283(7) exists, no cross-examination is allowed. There is no statutory authority to cross-examine a medical expert at an extent of disability hearing.

For these reasons, I believe that OAR 438-007-0005(3), to the extent that it allows for cross-examination of a medical expert at an extent of disability hearing, is invalid because the rule is inconsistent with ORS 656.283(7). Further, if no cross-examination of a medical expert is allowed at an extent of disability hearing, then part of the majority's premise collapses, defeating, in turn, its conclusion.

My third complaint is that the majority miscasts the limitations placed on the process of determining permanent total disability (PTD) as "ones of form, not substance." 159 Or App at 239. On the contrary, under Oregon statutes and case law, when we limit the exploration of PTD issues to written arguments and reports, we cannot help but limit the substance of what we discover. Two reasons for this are the "odd-lot" doctrine and ORS 656.206(3).

In *Welch v. Banister Pipeline*, 70 Or App 699, 701, 690 P2d 1080 (1984), we explained that:

"Under [the odd-lot doctrine,] a disabled person may remain capable of performing work of some kind but still be permanently disabled due to a combination of medical and nonmedical disabilities which effectively foreclose him from gainful employment. Such nonmedical considerations include age, education, adaptability to nonphysical labor,

mental capacity and emotional condition, as well as the conditions of the labor market."

In other words, whether a person is PTD under the odd-lot doctrine requires inquiry into a claimant's ability to "sell his services on a regular basis in a hypothetically normal labor market." *Harris v. SAIF*, 292 Or 683, 695, 642 P2d 1147 (1982). No doubt, vocational experts can establish boundaries for the "normal" labor market, but I question their ability to measure absolutely the nonmedical variables that can hamper an individual's efforts to "sell his services" within that market. My doubts are aggravated by ORS 656.206(3), which not only places on claimants the burden of proving PTD but also requires them to demonstrate both their willingness to seek regular employment and the reasonableness of their efforts to that end. Taken together, these factors do not contribute to the creation of a "sharply focused and easily documented decision" like the one at the heart of *Mathews*. 424 US at 343. Instead they create a situation where "a wide variety of information may be deemed relevant, and issues of witness credibility and veracity often are critical to the decision making process. * * * [I]n such circumstances 'written submissions are a wholly unsatisfactory basis for decision.' " *Id.* at 343-44.

As pointed as my disagreements with the majority are, a broader basis for my resistance to this case stems from what I perceive to be a general devolution of due process rights in Oregon Workers' Compensation Law. A brief review of the Workers' Compensation Law demonstrates this erosion.

At the turn of the century, an injured worker's sole recourse in Oregon was an often-difficult action at law. Recovery was impeded by a number of common-law doctrines that shifted the risk of an on-the-job injury to the worker while protecting the profits that the worker generated for the employer from tort liability. But even under that system, the worker had the right to a day in court and the right to personally be heard.

In 1913, this state adopted its first workers' compensation law. Or Laws 1913, ch 112. Its preamble provided, in part:

"The State of Oregon recognizes that the prosecution of the various industrial enterprises which must be relied upon to create and preserve the wealth and prosperity of the state involves the injury of large numbers of workmen, resulting in their partial or total incapacity or death * * *." ORS 656.004 (1979).[3]

The purpose of the law was to make injuries arising out of and in the course and scope of employment a valid cost of doing business in Oregon. The law removed the common-law impediments to industrial tort recovery for those workers not covered under the law and provided an alternative remedy for those the law covered. The new law was voluntary; an employer had to elect to be covered. ORS 656.002 to ORS 656.034 (1963). The new law augmented, rather than supplanted, an injured worker's ability to recover from the employer by creating an alternative forum within which to seek redress. It established a state commission to act as insurer, administrator, and quasi-adjudicator of on the job injuries. It created automatic compensation for industrial injuries, rigid benefit schedules, and an employer-supplied accident fund. Importantly, it retained the feature allowing injured workers personally to tell their stories. While this right occurred in an administrative setting, it maintained the inherent due process protections of traditional adjudicatory forums. If the injured worker was dissatisfied by a decision made by the State Insurance Accident Commission, the injured worker had the right to appeal to the circuit court. ORS 656.286(1) (1963). An injured worker was entitled, as a matter of right, to a jury trial on any question of fact and the court was bound by that finding. ORS 656.288(3) (1963) and 656.290(1) (1963).

In 1965, however, those protections began incrementally to disappear with changes in the law. Except for injuries caused by an employer's intentional acts, workers injuried on the job were no longer permitted the option of tort actions against their employers; the Workmens' Compensation Law became their exclusive remedy. ORS 656.018. Coverage against injury became compulsory for all. An injured worker

---

[3] This language remained until it was repealed in 1981 and replaced by ORS 656.012.

lost the right to a jury trial after review by the newly created Workmens' Compensation Board. ORS 656.712 (1965). In place of a jury trial the circuit court would review the entire record. The judge could receive additional evidence and could "make such disposition of the case as the judge determines to be appropriate." ORS 656.298(6) (1965).

In 1977, the legislature eliminated review by the circuit court. Instead the Court of Appeals directly reviewed orders by the Workers' Compensation Board.[4] This court could consider additional evidence and dispose of each case under *de novo* review. ORS 656.298 (1977). Ten years later, in 1987, *de novo* review was eliminated. ORS 656.298(6) (1987) (now numbered ORS 656.298(7)). Now we review the Board's decisions only to determine whether they are supported by substantial evidence and for errors of law. *Armstrong v. Asten-Hill Co.*, 90 Or App 200, 752 P2d 312 (1988).

Today, there is no opportunity for an injured worker to have a "day in court" before the worker's peers or anyone else, concerning the extent of the worker's disability. Initial disability determinations are not based on personal testimony but rather on paper trails created within the Workers' Compensation Division or collected by the employer. ORS 656.268. If the injured worker disagrees with a determination, a request for reconsideration will produce only another record review. The process specifically excludes the injured worker, or a representative, from personally appearing unless the agency asks the worker to appear, an invitation that is rarely, if ever, extended. OAR 436-030-0115(2). Thus, the determination of the extent of an injured worker's disability is made without the maker of that determination ever seeing or hearing the injured worker.

Injured workers may appeal the resulting reconsideration orders to an administrative law judge, but only evidence presented at reconsideration may be submitted at the subsequent hearing. ORS 656.283(7). The result is a Catch-22 of epic proportions: at the point where injured workers

---

[4] In 1977, the legislature changed the name of the Board from Workmens' Compensation Board to the Workers' Compensation Board. Or Laws 1977, ch 109, § 3.

would traditionally look into the face of an impartial adjudicator and tell their stories, they are precluded from doing so because they could not do so at the previous reconsideration proceeding. These things should not be. Due process requires more. Simple justice requires more.

We live in a time of unparalleled prosperity, a prosperity built, I believe, largely on the backs of working men and women. The 1913 Oregon Legislature recognized this fact when it declared that the wealth and prosperity of this state was created by industrial enterprises and that those enterprises caused injury to a large number of workers. In 1913, if one of those backs broke then the injured worker was entitled to a day in court to tell what happened and how the injury impacted the injured worker's capacity to earn a living. Now, however, should one of those backs break, our system of industrial justice no longer extends to the injured that most elemental of courtesies: a moment to relate, in person, the extent of their injury to those appointed to judge the extent of their disability. In our attempt at efficiency, we have succeeded only in eliminating from the dialogue a small vestige of our humanity. We have created order without asking if it is, in fact, *good* order. The result, I think, moves us toward a bureaucratic ghetto wherein the voices of injured workers are silenced by a system that resembles justice, but denies the power thereof.

I, therefore, dissent.

De Muniz, J., joins in this dissent.