Argued and submitted March 2, reversed and remanded for reconsideration December 13, 2000

Diane PONDER,
*Petitioner,*

*v.*

EMPLOYMENT DEPARTMENT
and Garlington Center,
*Respondents.*

(98-AB-1382; CA A103346 (Control))

Janet BARDOSSI,
*Petitioner,*

*v.*

EMPLOYMENT DEPARTMENT
and Garlington Center,
*Respondents.*

(98-AB-1266; CA A103347)

Robin HOCHTRITT,
*Petitioner,*

*v.*

EMPLOYMENT DEPARTMENT
and Garlington Center,
*Respondents.*

(98-AB-1377; CA A103348)

Tim FOULKE,
*Petitioner,*

*v.*

EMPLOYMENT DEPARTMENT
and Garlington Center,
*Respondents.*

(98-AB-1381; CA A103349)

David HANSON,
*Petitioner,*

*v.*

EMPLOYMENT DEPARTMENT
and Garlington Center,
*Respondents.*

(98-AB-1375; CA A103350)

Diane BADER,
*Petitioner,*

*v.*

EMPLOYMENT DEPARTMENT
and Garlington Center,
*Respondents.*

(98-AB-1376; CA A103351)

Barbara HANNA,
*Petitioner,*

*v.*

EMPLOYMENT DEPARTMENT
and Garlington Center,
*Respondents.*

(98-AB-1378; CA A103352)
(Cases Consolidated)

15 P3d 602

Jeremy V. Sarant argued the cause for petitioners. With him on the brief were Sandra A. Hansberger, Emily K. Morris, Certified Law Student, and Lewis and Clark Legal Clinic.

David Farris Coursen, Assistant Attorney General, argued the cause for respondent Employment Department. With him on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

No appearance by respondent Garlington Center.

Before De Muniz, Presiding Judge, and Haselton and Wollheim, Judges.

WOLLHEIM, J.

## WOLLHEIM, J.

At the times relevant to this petition, the Garlington Center was a nonprofit organization working under contract with Multnomah County to provide out-patient mental health services to chronically and severely mentally ill clients in Northeast Portland. The vast majority of Garlington's clients have been diagnosed with schizophrenia. Others have bipolar disorder or organic brain disease. Some patients were referred by the Psychiatric Security Review Board (PSRB). Garlington's psychiatric staff was responsible for the prescription and administration of medications, mostly anti-psychotics, to Garlington's clients.

Claimants are seven former employees of Garlington who resigned from their positions in February and March 1998. They sought unemployment compensation, and the Employment Department (the Department) denied their claims, concluding that they had voluntarily quit without good cause. After hearings, the hearings officer awarded benefits. Garlington appealed to the Employment Appeals Board (EAB), which reversed the hearings officer's orders and denied benefits to each claimant. The matters have been consolidated in these petitions for judicial review. We hold that EAB erred as a matter of law in failing to consider, in its determination of good cause, evidence of circumstances after claimants submitted their letters of resignation and until their separations from employment. We therefore reverse and remand for reconsideration.

Each claimant left employment with Garlington during a time when the organization was experiencing extreme financial difficulty and significant conflict between its executive director, Phyllis Paulson, and upper and mid-level management. Briefly stated, claimants quit because they believed that Paulson's management style and decisions placed the needs of clients at risk and compromised the organization's ability to provide appropriate care, and they did not believe they could ethically continue to work under her. EAB disagreed that Paulson's decisions had created a situation so grave that a reasonable person had no reasonable alternative to quitting.

■     Our analysis of the case begins with the pertinent statute. ORS 657.176(2)(c) provides that an individual who has voluntarily left work without "good cause" is disqualified from the receipt of unemployment benefits. The term "good cause" is one of delegation, *see Springfield Education Assn. v. School Dist.*, 290 Or 217, 228-30, 621 P2d 547 (1980), pursuant to which the agency must "complet[e] a value judgment that the legislature itself has only indicated." *McPherson v. Employment Division*, 285 Or 541, 550, 591 P2d 1381 (1979). The agency has exercised its discretion and interpreted ORS 657.176(2)(c) through the promulgation of OAR 471-030-0038(4), which provides that to establish "good cause," a claimant must show that his or her reasons for voluntarily terminating employment were "of such gravity" that he or she "ha[d] no reasonable alternative but to leave work." The facts concerning what took place here are undisputed. The question on judicial review is whether EAB's findings are sufficient, as a matter of law, to support its conclusion that claimants did not have good cause.

We first summarize the uncontroverted facts that apply to all claimants:

During most of 1997, Garlington's medical staff included two full-time psychiatrists, Drs. Drakos and Bishoff. In May or June 1997, Garlington began to experience financial difficulties. In October 1997, Paulson, who had been Garlington's executive director for over four years, advised Garlington's Board of Directors of a serious budget deficit and asked the different department directors for ideas on how to reduce expenses. In December 1997, Paulson hired Pragmatix Corporation as a consultant to develop a plan for reorganization and downsizing. Only executive level employees were aware of the decision to hire Pragmatix. In January 1998, Bischoff quit, leaving his caseload of 150 clients to be divided between Drakos and claimant Foulke, a nurse practitioner. Foulke testified that after this transition, he had approximately 250 patients and felt stretched to the limits of his ability to practice competently.

In January 1998, Drakos and Hanson, a licensed professional counselor working under Drakos, prepared a reorganization plan and submitted it to Paulson. Paulson

rejected the plan and told Hanson and Drakos that in submitting a plan for reorganization they were out of line and insubordinate. Also in January 1998, on Pragmatix's recommendation, Paulson announced that there would be a substantial reorganization and layoff of staff. Those changes were objectionable to many of the staff, who made known their concerns that the planned reorganization would disrupt client treatment and compromise client safety. Mid-level managers wrote to Paulson setting forth their concerns and asking for a meeting. On January 26, on the recommendation of Pragmatix, Garlington gave 26 employees two weeks' notice of layoff, to be effective February 6, 1998.

On January 29, Paulson agreed to meet with 11 mid-level managers to discuss their concerns, which were critical of Paulson and were not well received. The managers expressed their views that they should have been included in downsizing discussions at an earlier stage, that Garlington should have used in-house skills to resolve the organization's problems instead of hiring Pragmatix, and that upper management felt thwarted by Paulson's autocratic, derogatory, and humiliating style of micro-management.

On February 2, 1998, supervisors were told that Paulson was enacting a retroactive pay cut, which claimants believed was in retaliation for their criticism at the meeting of January 29, but which apparently was never implemented.

On February 3, 1998, 15 managers signed and delivered a letter to the chair of Garlington's Board of Directors, expressing concern about the organization's continued survival and its ability to care for clients and attributing primary responsibility for the organization's problems to Paulson's poor management and her failure to include them in planning. They expressed the concern that in planning the reorganization, Paulson had neglected the needs of clients and had become alienated from the majority of clinical programs.

On the afternoon of February 4, 1998, Paulson advised Drakos, the agency's medical director and the only remaining physician in the adult program, that he was being terminated as of February 20, that in the interim he would be on paid leave of absence, and that he was not to return to the

clinic without notifying Paulson. Paulson explained to Drakos that he was being terminated because of his failure to comply with her instructions, his lack of support and participation during the reorganization, his statement that he did not want to perform management duties, and his sabotaging of her executive decision about additional psychiatric coverage. Drakos' dismissal left Garlington without a physician in its adult program of over 400 clients.

In a February 5, 1998, memorandum, Paulson advised management that Drakos would no longer work at Garlington and that she was in the process of making arrangements to find a replacement:

> "Nick Drakos will no longer be working at Garlington Center. His last day was yesterday. I will not go into anymore detail about the reasons for Nick's departure. If you want to talk to him about his departure, please contact him directly.

> "I may have someone available on a full-time basis. If not, we may have to cover his position with a number of part-time individuals. In any case, we will get by. If anyone has any suggestions, please let me know."

Drakos was scheduled to see 14 patients on February 5. Additionally, approximately 12 to 14 patients were scheduled to receive their monthly or biweekly medication injections on that date. Paulson believed that Drakos' medical orders were effective until February 20, his termination date. However, on the morning of February 5, 1998, Drakos telephoned claimant Hanna, the medical coordinator/nurse supervisor, and rescinded all his medical orders, thereby creating uncertainty as to whether providers at different facilities could administer medications. Specifically, personnel whose professional licenses did not permit them to prescribe medication were concerned that if they dispensed medication without a physician's orders, they would be in violation of their licenses' restrictions. Both Hanna and Foulke were told by Paulson's assistant that business was to run "as usual" at the clinic despite the absence of a doctor. Nonetheless, they refused to administer medication to patients without a physician's order, and the result was described by claimants as "disastrous," "inexcusable," "dangerous," and "risky."

Patients who had appointments with Drakos on February 5 were upset when they learned he was no longer there. Clients became confused, anxious and agitated while in the medical clinic lobby when nurses could not tell them when a physician would be available. Hanson testified that the waiting room was full of people who needed medication and did not know how to get it. Neither Hanna nor Foulke had been told by Paulson when there would be physician coverage.

On February 5, 15 employees submitted a memorandum to the Board demanding that Paulson be removed and that Drakos be restored as medical director, asserting that "sound and safe clinical care cannot be provided with the present direction and leadership of * * * Paulson." Also on February 5, claimants Bardossi, Foulke, Hanna, Hanson, and Hochtritt separately submitted their resignations. Two other claimants, Bader and Ponder, gave their notices on February 6 and 9, respectively.

To make matters worse, on February 6, the earlier announced layoff of 26 employees took effect. Beginning February 6, Dr. Bazell, a psychiatrist with Garlington's childrens' program, came to assist in the adult psychiatric program, which claimant Ponder said left the childrens' program without a psychiatrist. On that date, one client who was scheduled to receive new medication "decompensated" and hit a staff member and another client. Paulson stated her expectation that Drakos' orders be honored until February 20 and that staff make no referrals outside of the clinic. During the week of February 9 to February 13, contract doctors were on the premises for six to seven hours per day, but they were not familiar with the clients' cases and were not able to see all clients who needed to be seen. Hanna never received a schedule of when a psychiatrist would be on the premises and continued to refer patients to other clinics.

On February 9, 1998, the Board of Directors met with six managers, who presented their demand that Paulson be terminated or they would resign. On February 10, the Board announced that it gave Paulson its unanimous vote of confidence and would retain Pragmatix to aid in a resolution of the agency's crises. The Board invited staff to stay

on. On February 11, 1998, in response to complaints from clients, staff, and families, representatives of the Multnomah County Behavioral Health Division visited Garlington to determine whether Garlington was complying with its contract to deliver mental health services. The county concluded that Garlington was in compliance with administrative rules governing the provision of mental health services. Bader, Foulke, Hanna, Hanson, and Hochtritt left work on February 13. Bardossi and Ponder left work on March 6, 1998.

We now summarize the facts that pertain to each claimant:

Bader was an employee of Garlington from February 12, 1996 to February 13, 1998. She last worked as the housing coordinator, a management position under the supervision of the community support services director. On February 5, Bader learned that clients were not receiving medication as a result of providers' reluctance to dispense without a physician's orders. Bader attempted to remedy the situation by calling Hanna, the medical coordinator/nurse supervisor, and asking her to call providers. Bader then filed a protective service report with Multnomah County for alleged violations of clients' rights and lack of appropriate care and services and for the alleged violation of an administrative rule requiring the presence of a signed physician's order before dispensing medication. Bader tendered her resignation in early February, citing her disagreement with Paulson's management decisions and her concern that Paulson's decisions threatened the existence of the organization. She also expressed concern for her own health, the safety of staff and clients, and client care.

Bardossi worked for Garlington from March 22, 1996 to March 6, 1998, last serving as clinical supervisor of the residential team. Bardossi quit work because she thought that Paulson had created a hostile work environment and because she thought that, as a result of Drakos' termination, Garlington could not provide safe and sound clinical care.

Foulke worked at Garlington from October 1993 until February 13, 1998, as a psychiatric nurse practitioner under Drakos. He was authorized to prescribe medications. On the February 5, Paulson asked Foulke to cover for

Drakos. Foulke, who was already managing a caseload of 250 patients, refused, because it would involve taking on another 250 clients without a physician's back-up, which he felt would jeopardize clients' safe care and his professional standing. Foulke quit work because he considered the work environment to be unsafe for himself and others in providing inadequate medical care, he believed his license to be at risk, and he considered the clinical environment to have been dangerously compromised.

Hanna worked for Garlington from February 1992 until February 13, 1998, as a medical coordinator/nurse supervisor under the direction of Drakos. In the absence of a physician, Hanna considered herself unable to practice without risking violation of her licensing board's standards of practice. She did not dispense any medication on February 5 or thereafter without a doctor's order. She was largely responsible for dealing with clients who came to see Drakos on February 5. Paulson stated her expectation that Hanna and Garlington's nursing staff treat Drakos' orders as in effect until February 20, and she expected the nurses to abide by the orders. Hanna advised Paulson that she and the nurses would not do so, because they did not consider the rescinded orders as in effect and considered the dispensing of medication without a doctor's order to be a violation of nursing codes and standards of practice. Paulson told Hanna that she was insubordinate. Hanna continued to refer clients elsewhere for their medications. Hanna quit because she disagreed with Paulson's management style and decisions, because she believed that after the firing of Drakos the environment at Garlington was unsafe for herself and for the clients, that clinic care was compromised, and that her professional license was in jeopardy.

Hanson worked at Garlington from September 1987 until February 13, 1998, in his final position as a team leader on the intensive care management team, supervising eight or nine case managers, whose clients were the most disabled and had the highest potential for relapse and rehospitalization. He is a licensed professional counselor and worked directly under Drakos. Hanson quit because he believed that Paulson's firing of Drakos placed him in an ethical dilemma

over the organization's ability to care for clients. He also was motivated by concerns for his personal safety, his disagreement with Paulson's management, and his personal health.

Hochtritt worked for Garlington from March 1997 until February 13, 1998, as a registered psychiatric nurse, under the supervision of Hanna, the medical coordinator/nurse supervisor, who in turn worked for Drakos. Hochtritt quit because she was being asked to dispense medication and believed that, as a licensed nurse, she could not follow Drakos' rescinded orders. In her notice of resignation, she stated that she was ethically unable to continue working under the direction of Paulson, because Paulson had placed the agency, clients and the community in jeopardy through her management style and by the firing of Drakos. After Drakos rescinded his orders on February 5, someone told Hochtritt that she should continue to dispense medication as usual. Hochtritt received information from the Board of Nursing that if she dispensed medication on rescinded orders, she faced potential legal liability. Hanna, her supervisor, also told her that she could not dispense medication without a valid order.

Ponder is a licensed clinical social worker who worked for Garlington from December 1993 until March 6, 1998, as the director of child and family services, under the supervision of Paulson. Ponder quit because she thought Paulson had created an intolerable work environment and because of concerns for her health and the care of clients due to Paulson's decision to fire Drakos.

EAB rejected each claimant's claim, reasoning that each asserted basis was insufficient to constitute good cause. EAB wrote a separate opinion for each claimant, but EAB's explanations are generally consistent from one order to the next.

• **Paulson's management style and decisions:** Every claimant claimed to be motivated to quit in part because of Paulson's management style, most specifically her decision to fire Drakos without a back-up physician in place. EAB's general response to the complaint of poor management was that a reasonable and prudent person would have

recognized that people manage in different ways and that one cannot reasonably expect to agree with the style or decisions of upper management. EAB said that claimants' evidence was too general and lacked sufficient details of poor management to establish that Paulson's management had personally adversely effected them. EAB determined that the specific examples that some claimants provided of improper management were not sufficiently grave to justify quitting.

• **Hostile work environment:** Several claimants (Bader, Bardossi, Ponder) asserted that Paulson's management style had created a hostile or intolerable working environment. EAB's opinion describes claimant's concerns as general complaints of management style, that Paulson was autocratic, inflexible and inefficient, that her interactions with staff were generally disapproving and controlling, and that she had a tendency to micro-manage and second-guess employees and to label all who had differences of opinion as disloyal. Again, EAB found that the described circumstances were not sufficiently personal to each claimants to show that Paulson had created a hostile work environment.

• **Personal safety:** Several claimants, specifically those who worked directly with clients (Hochtritt, Hanson, Hanna, Foulke, Bardossi, Bader), testified that they believed their personal safety or that of the clients to be at risk without a doctor on the premises who could prescribe medication to potentially violent clients. Although EAB noted two or three situations where clients became threatening as a result of the lack of a physician, it found that the evidence was not persuasive that claimants or clients were at risk of serious bodily harm.

• **Personal health symptoms:** Most claimants (Bader, Foulke, Hanna, Hanson, Hochtritt, Ponder) said that they were motivated to quit in part because of adverse health symptoms (insomnia, abdominal problems, sadness) caused by Paulson's management at Garlington. For many and varied reasons, EAB rejected claimants' health concerns as a ground for quitting.

• **Risk of professional discipline:** All claimants testified that they could not ethically continue to work under Paulson, because her management demonstrated a lack of

concern for clients and left Garlington unable to provide adequate client care. Two claimants who were members of the nursing staff, Hanna and Hochtritt, believed they could not administer medication on February 5, 1998, and that if they complied with Paulson's requirement that they continue to do so, they would be in violation of their professional licenses. Further, claimants testified that Paulson's management decisions, most specifically the firing of Drakos, had so compromised client care that it would be unethical for them to continue to work for Garlington. EAB found that the brief period of confusion on February 5 was not sufficient to cause a reasonable person to quit and that Garlington took steps the next day to provide medical coverage for clients or to refer them elsewhere. EAB said in the order in Bader's case that "while the employer might have made a smoother transition in medical coverage, claimant failed to persuade us that its failure to do so created such a grave situation she could not have continued to work." Furthermore, EAB found that, because nursing staff had refused to comply with Paulson's order, they had not, in fact, been forced to commit unethical acts and that they had not suffered adverse consequences as a result of their refusal to administer medication. EAB concluded that, given Multnomah County's determination on February 11 that Garlington was in compliance with laws and administrative rules governing the provision of mental health services, the level of care was not so deficient that a reasonable and prudent person would have quit.

■ Claimants raise multiple assignments or error. In their seventh and eighth assignments, they challenge EAB's failure to consider, in evaluating "good cause," the circumstances at Garlington after claimants submitted their letters of resignation up to their dates of separation from employment. Because we conclude that those assignments are dispositive and require reversal, we do not address the remaining assignments.

With regard to claimants Bardossi and Hanson, EAB explicitly said in its orders that it considered the reasonableness of claimants' decision to quit in response to Paulson's management only in light of the events that took place on or before February 5, the date on which they submitted their notices of resignations, and declined to consider

events that occurred after claimants submitted their notices, because those events "could not have formed the basis for claimant's decision to quit work." Furthermore, with regard to all claimants, the Department concedes in its brief that EAB determined that "the relevant working conditions were those in place when petitioners decided to resign." That was clearly error. The Department's administrative rule, OAR 471-030-0038(1)(a), provides that a person is at "work" so long as there is an employer-employee relationship and until the separation from employment. OAR 471-030-0038(1)(a) expressly applies to the term "work" as it is used in all subsections of OAR 471-030-0038. Accordingly, for purposes of determining "good cause" for voluntarily leaving work under OAR 471-030-0038(4), the circumstances that existed up to the time of claimants' voluntary separation from employment are relevant.[1]

Here, because Garlington was willing to allow claimants to continue to work after the period stated in their notices of termination,[2] claimants voluntarily left work on their last day of work, and the circumstances that existed from the time between the notices of termination and the last day of work were relevant to the good cause inquiry.[3] Accordingly, EAB should not have refused to consider events and

---

[1] OAR 471-030-0038(1)(a) provides, in part:

"As used in ORS 657.176(2)(a), (b), and (c) and sections (1) through (5) of this rule the term 'work' means the continuing relationship between an employer and an employee. With the exception of the provisions of ORS 657.221(2)(a), the date an individual is separated from work is the date the employer-employee relationship is severed."

OAR 471-030-0038(4) provides that good cause for voluntarily leaving work is a reason "such that a reasonable and prudent person of normal sensitivity exercising ordinary common sense would leave work."

[2] The Garlington Board of Directors' response to claimants' notices of resignation provided, in part:

"On behalf of the agency, I invite you to continue to work with us to provide mental health services to the citizens of North/Northeast Portland. However, if you do not want to do so, I hereby accept your resignation on behalf of the agency."

[3] We do not decide whether, if Garlington had unequivocally accepted claimants' notices of termination and had not allowed them to continue working beyond the period stated in their notices, the circumstance during the time between the notices and the last day of work would have been relevant to the question of good cause.

circumstances after the dates of claimants' letters of resignations but before their actual voluntary separations from employment. We therefore reverse and remand all claims to EAB for reconsideration of its conclusion that claimants did not have good cause.

Reversed and remanded for reconsideration.